# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
**Case. No. _____**

| | |
|---|---|
| OLUBUSAYO ADESANYA, M.D., | |
| Plaintiff, | **COMPLAINT** |
| v. | **(JURY TRIAL DEMANDED)** |
| CUMBERLAND COUNTY HOSPITAL SYSTEM, INC. d/b/a CAPE FEAR VALLEY HEALTH SYSTEMS, CAPE FEAR VALLEY HEALTH, CAPE FEAR VALLEY BEHAVIORAL HEALTH CARE, and/or CAPE FEAR VALLEY MEDICAL CENTER AND KENNETH FLEISHMAN, M.D., | |
| Defendants. | |

COMES NOW Plaintiff Olubusayo Adesanya, M.D. ("Dr. Adesanya"), by and through undersigned counsel, and brings this action against Defendant Cumberland County Hospital System, Inc. d/b/a Cape Fear Valley Health Systems, Cape Fear Valley Health, Cape Fear Valley Behavioral Health Care, and/or Cape Fear Valley Medical Center ("Defendant CCHS") and Kenneth Fleishman, M.D. ("Defendant Fleishman") (collectively, "Defendants"), alleging as follows:

## INTRODUCTION

1.	Dr. Adesanya is a black female physician and psychiatry resident who began employment with Defendant CCHS in approximately June 2025 as a second-year psychiatry resident at Cape Fear Valley Medical Center ("CFV Medical Center").

2. After Dr. Adesanya reported sexual harassment by Defendant Fleishman and patient safety concerns she had witnessed, Defendant CCHS retaliated against Dr. Adesanya by placing her on probation for multiple deficiencies a mere thirty-two days after Defendant CCHS had given Dr. Adesanya an almost perfect residency evaluation.

## PARTIES

3. **Plaintiff Olubusayo Adesanya, M.D. ("Dr. Adesanya")** is a citizen and resident of Cumberland County, North Carolina.

4. **Defendant Cumberland County Hospital Systems, Inc. ("Defendant CCHS")** is a North Carolina corporation with its principal place of business in Fayetteville, Cumberland County, North Carolina.  It can be served through its registered agent for service, Michael Nagowski, at its registered address at 1638 Owen Drive, Fayetteville, North Carolina, 28304.

5. At all times relevant herein, Defendant CCHS did business as Cape Fear Valley Health Systems, Cape Fear Valley Health, Cape Fear Valley Behavioral Health Care, and/or Cape Fear Valley Medical Center.

6. Defendant CCHS is in the business of providing health care.

7. Defendant CCHS owns and operated Cape Fear Valley Medical Center, located at 1638 Owen Drive, Fayetteville, North Carolina, 28304.

8. **Defendant Kenneth Fleishman, M.D. ("Defendant Fleishman")** is, upon information and belief, a citizen and resident of Cumberland County. North Carolina.

9. At all times relevant herein, Defendant Fleishman was a supervising attending physician in the Child and Adolescent Psychiatry department at Cape Fear Valley

Medical Center and the department chair for Defendant CCHS's psychiatry residency program.

**JURISDICTION, VENUE, AND CONDITIONS PRECEDENT**

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is an action based on violations of Title VII.

11.     This Court has supplemental jurisdiction over Dr. Adesanya's state common law claims pursuant to 28 U.S.C. § 1367.

12.     Defendants are each subject to the personal jurisdiction of this Court because they each reside in or have their principal place of business in this judicial district.  Further, Defendants are both present in and regularly transact business in this judicial district and engaged in the conduct that is the subject of this lawsuit within this judicial district.

13.     Venue is proper in this Court proper as the events giving rise to this action occurred in Cumberland County, and both Defendants, upon information and belief, reside or have offices in Cumberland County, which is within this judicial district.

14.     Dr. Adesanya timely filed a Charge of Discrimination with the EEOC on or about February 13, 2026 (Charge No. 433-2026-01608).[1]

15.     On February 28, 2026, Dr. Adesanya received her Notice of Right to Sue.

16.     This lawsuit is being filed within all applicable statutes of limitations and repose, and Dr. Adesanya has exhausted her administrative remedies as required under applicable law.

---

[1] Following the filing of this lawsuit, Dr. Adesanya will be filing a second EEOC charge to encompass the events that have taken place in the past 180 days.

3

## FACTUAL ALLEGATIONS

### Background

17.     Dr. Adesanya graduated from Meharry Medical College in Nashville, Tennessee, with her Master of Health Science in 2018 and her Doctor of Medicine of 2023.

18.     After successfully completing her first year of residency in Family Medicine at Atrium Health Floyd Medical Center in Rome, Georgia, Dr. Adesanya transferred to a psychiatry residency program at CFV Medical Center in Fayetteville, Cumberland County, North Carolina, to pursue psychiatry instead of family medicine.

19.     Upon information and belief, Defendant CCHS owns and operates CFV Medical Center, which is an acute care teaching hospital facility, and other health care facilities in and around Cumberland County, North Carolina.

20.     Defendant credited Dr. Adesanya's prior residency experience such that she could enter Defendant's psychiatry program as a second-year psychiatry resident rather than restarting as a first-year psychiatry resident.

21.     Defendant represented to Dr. Adesanya that this accommodation was being made because of Dr. Adesanya's exceptional academic and clinical performance.

22.     In June 2025, Dr. Adesanya received her Resident Training License from the North Carolina Medical Board.

23.     Dr. Adesanya began employment with Defendant CCHS in June 2025.

24.     At all times relevant herein, Dr. Adesanya was employed pursuant to a Postgraduate Training Agreement between Defendant CCHS and Dr. Adesanya.

4

25. This Postgraduate Training Agreement ran from June 2025 to June 2026, with the option for Defendant CCHS to renew or extend it.

26. The Postgraduate Training Agreement provided for annual compensation of approximately $62,951.00 with benefits.

27. Dr. Adesanya reasonably anticipated continued employment with Defendant through completion of her psychiatry residency and eventual advancement into an attending psychiatrist position.

**Dr. Adesanya's ED Psych Rotations**

28. Dr. Adesanya's first rotation at CFV Medical Center was in Emergency Department Psychiatry ("ED Psych") from approximately June 30, 2025, to July 27, 2025.

29. Notably, despite this rotation being Dr. Adesanya's first-ever psychiatry rotation, she received overwhelmingly positive evaluations from supervising physicians and faculty members with multiple evaluators assessing Dr. Adesanya as performing between a Level 2 and Level 3 psychiatry resident under the Accreditation Council for Graduate Medical Education ("ACGME") Psychiatry Milestones framework,[2] reflecting that Dr. Adesanya was functioning well above the level typically expected of a resident newly entering psychiatry training.

---

[2] The ACGME Psychiatry Milestones framework is a competency-based system used to assess the development of psychiatry residents during training in ACGME-accredited residency programs. *See* Accreditation Council for Graduate Medical Education, *Psychiatry Milestones* (2020), https://www.acgme.org/globalassets/pdfs/milestones/psychiatrymilestones.pdf (last visited 28 May 2026).

5

30. Dr. Adesanya's second ED Psych rotation was from approximately October 10, 2025, to November 16, 2025.

31. For both ED Psych rotations, multiple evaluators offered exceptional praise for Dr. Adesanya's performance.

32. After Dr. Adesanya's first ED Psych rotation, Dr. Klenzak — the program director for the psychiatry residency program at CFV Medical Center — noted that "Dr. Adesanya did a GREAT job on her first rotation at CFV. She is bringing a lot of skills and I saw clear progress each week during the rotation. She has a great bedside manner and is calm and clear with patients and staff. We are SO glad she is here in the program[.]"

33. After Dr. Adesanya's second ED Psych rotation, Dr. Klenzak commented that "Dr. Adesanya has made clear progress since her last time in the [Emergency Department]. She truly takes ownership of her patients and strives every day to do her best. She feels more comfortable and relaxed with the team and appears to understand and appreciate the importance of collaboration."

34. Dr. Victoria Teague had a similar evaluation of Dr. Adesanya, highlighting that "Dr. Adesanya shows empathy and compassion for her patients; she is often able to build rapport with challenging patients."

35. Likewise, Dr. Audrey Petteruti noted that "Dr. Adesanya has a compassionate approach to patient care!"

36. Dr. Breonna Kinnison noted that Dr. Adesanya "genuinely cares about every patient and does everything in her power to establish a strong therapeutic rapport. She has strong medical knowledge, truly wants to soak up every learning opportunity, and is a

6

strong advocate for her patients. . . . Her patients are lucky to have her in their corner, and I think she makes a great addition to this program!"

## Dr. Adesanya First Experiences Sexual Harassment

37. On September 2, 2025, while completing her Adolescent IP Psych rotation under the supervision of Defendant Kenneth Fleishman, he sexually harassed Dr. Adesanya.

38. Specifically, Defendant Fleishman forced Dr. Adesanya into a supply closet and physically blocked Dr. Adesanya's only exit out of the supply closet.

39. Defendant Fleishman then began advancing closer and closer to Dr. Adesanya while telling her that she was not very smart and that some women deserve to be raped.

40. Before Defendant Fleishman could continue any further, another employee opened the door to the supply closet, allowing Dr. Adesanya to immediately flee.

41. Dr. Adesanya verbally reported this incident to her program director, Dr. Klenzak, and her program coordinator, Ms. Arielle King.

42. Ms. King asked Dr. Adesanya if Dr. Adesanya wanted Ms. King to chaperone her rotation under Defendant Fleishman, but Dr. Adesanya, fearing repercussion from Defendant Fleishman, declined Ms. King's offer.

43. Dr. Adesanya, who believed she would have no more rotations requiring her to work with Defendant Fleishman, decided to persevere and continue her work.

44. To date, Defendant CCHS has done no investigation into Defendant Fleishman, his conduct on that date, or Dr. Adesanya's report to Dr. Klenzak.

**Dr. Adesanya's CCC Evaluation**

45. On December 12, 2025, Dr. Adesanya had her semi-annual evaluation meeting with the Clinical Competency Committee ("CCC"), a committee of CFV Medical Center faculty members who meet to review residents' performance data.

46. Dr. Adesanya's CCC evaluation noted that Dr. Adesanya "[g]enuinely cares about every patient and does everything in her power to establish a strong therapeutic rapport," that Dr. Adesanya "is a strong advocate for her patients," and that Dr. Adesanya has a "[g]reat bedside manner and is calm and clear with patients and staff."

47. The CCC evaluation further noted that Dr. Adesanya had "strong medical knowledge" and was a "[g]reat addition to this program."

48. The CCC evaluation listed several areas for improvement — such as Dr. Adesanya's confidence, note-taking, and incorporation of feedback — but noted that "there was no relative deficit in these areas noted, just guidance on the overall importance of these areas."

**Dr. Adesanya's Adolescent IP Psych Rotation and
Second Episode of Sexual Harassment**

49. From approximately December 15, 2025, to January 11, 2026, Dr. Adesanya was assigned to the Adolescent In-Patient Psychiatry ("Adolescent IP Psych") rotation under the supervision of Dr. Hudaisa Hafeez.

50. During the third week of her rotation, Defendant Fleishman stepped in for Dr. Hafeez as the supervising physician.

8

51. Defendant CCHS, despite its awareness of Dr. Adesanya's previous complaint against Defendant Fleishman, never provided Dr. Adesanya with any notice that Defendant Fleishman would be stepping in for Dr. Hafeez.

52. This was Dr. Adesanya's first time working with Defendant Fleishman since the September assault.

53. During one particularly shocking encounter involving a minor patient who had been raped by the minor patient's adult brother, Defendant Fleishman rebuffed Dr. Adesanya's pleas to alert DSS about the minor patient's situation.

54. Defendant Fleishman asked Dr. Adesanya if she knew what incest was.

55. Dr. Adesanya replied in the affirmative, and Defendant Fleishman then asked Dr. Adesanya if she thought incest was morally wrong.

56. When Dr. Adesanya again replied in the affirmative, Defendant Fleishman told Dr. Adesanya that it was "elitist" of Dr. Adesanya to think that a minor patient being raped by an adult sibling was "neglect" or "sexual abuse" or even "wrong."

57. Defendant Fleishman then told Dr. Adesanya he hoped that Dr. Adesanya would be raped one day and that it would be "very fortunate" for him if Dr. Adesanya were sued by the minor patient's mother.

58. During another encounter with Defendant Fleishman during this rotation, on or about January 2, 2026, he publicly screamed at Dr. Adesanya in front of another resident physician and repeatedly ordered her to "come here." Dr. Adesanya, fearful of a repeat of the September 2, 2025, incident with Defendant Fleishman, refused and left Defendant Fleishman's presence.

9

59. Dr. Adesanya, again, reported her concerns about Defendant Fleishman to her program director, Dr. Klenzak, and her program coordinator, Ms. King.

60. In response, Dr. Klenzak simply surmised about "how hard this must be for [Dr. Adesanya]," and Ms. King's proffered solution was to have Dr. Adesanya take the day of December 23, 2025, off work without the need for Dr. Adesanya to use PTO or a sick day.

61. Despite having to face Defendant Fleishman again during this rotation, Dr. Adesanya's end-of-rotation evaluation stated that her "empathy and hopefulness for a patient's improvement and success is evident in all she does" and that she "showed improvements throughout the rotation."

62. Dr. Adesanya's evaluation encouraged her to "[c]ontinue to study [the] DSM and pharmacology to help build a firm foundation in these areas" but noted that Dr. Adesanya had "no relative deficit in these areas noted."

### Dr. Adesanya's Report of Patient Safety Concerns

63. On December 21, 2025, during Dr. Adesanya's Adolescent IP Psych rotation under the supervision of Dr. Hudaisa Hafeez, Dr. Adesanya observed serious patient safety concerns, including, but not limited to, prescribing contraindicated medications to vulnerable psychiatric patients, discouraging disclosure of medication side effects to both patients and their parents, and failing to appropriately respond to allegations of child abuse, sexual abuse, suicidality, and psychosis.

10

64. Dr. Adesanya verbally reported her concerns to her program coordinator, Ms. King, on December 22, 2025, and to her program director, Dr. Klenzak, on December 31, 2025.

65. On January 5, 2026, Dr. Adesanya sent Dr. Klenzak an email with these concerns.

66. Specifically, Dr. Adesanya informed Dr. Klenzak about the following:

a. On December 16, 2025, Dr. Hafeez initially forbade Dr. Adesanya from filing a CPS report on a minor patient who had reported physical abuse and then, the next day, "picked up" the minor patient from Dr. Adesanya and prohibited Dr. Adesanya from seeing the minor patient or speaking with the minor patient's parent.

b. On December 19, 2025, Dr. Hafeez forbade Dr. Adesanya from inquiring about a patient's eating disorder history, despite the relevance of that information for determining the clinical appropriateness of whether Dr. Adesanya should prescribe the patient with a stimulant medication.

c. On December 22, 2025, Dr. Adesanya asked Dr. Hafeez if they could obtain a baseline EKG for a patient she and another physician had placed on an antipsychotic because antipsychotic medications can carry known cardiovascular risks, but Dr. Hafeez declined and responded that Dr. Adesanya cannot "just get labs for just anything."

d. That same day, Dr. Adesanya saw a teenage patient presenting with suicidal ideation, and Dr. Adesanya suggested screening the patient for substance use. Dr. Hafeez scoffed at Dr. Adesanya's suggestion and told Dr. Adesanya to take Dr. Hafeez's feedback and "keep quiet and just agree" so Dr. Adesanya would not get into trouble. Dr. Hafeez told Dr. Adesanya to stop asking her questions because Dr. Hafeez was "just here to do [her] job and that's it."

e. During Dr. Adesanya's second week of the rotation, Dr. Hafeez refused to call a parent of a minor patient because she did not feel like providing a letter that the parent needed for social work purposes.

f. Despite Dr. Adesanya's pleas for guidance during Dr. Adesanya's first and second weeks of the rotation, Dr. Hafeez refused to prepare Dr. Adesanya for

11

Dr. Adesanya's first court appearance in which she had been called to advocate for one of her patients.

g. Defendant Fleishman, while stepping in for Dr. Hafeez, actively worked against Dr. Adesanya to advocate for a minor patient who was being raped by her older brother and who was being sold by her mother for cocaine.

67. Upon information and belief, Defendant CCHS had long been aware of significant patient safety concerns at CFV Medical Center.

68. Prior to Dr. Adesanya's employment with Defendant CCHS, CFV Medical Center had been placed on "immediate jeopardy" status — the most severe patient safety finding available under federal healthcare regulations — on multiple occasions due to serious patient safety failures involving psychiatric patients and failures to report child abuse.

**Retaliation Against Dr. Adesanya**

69. On January 5, 2026 — the same day that Dr. Adesanya emailed Dr. Klenzak with the patient safety concerns she had witnessed — Dr. Adesanya was pulled from her Adolescent IP Psych rotation.

70. Eight days later, on January 13, 2026, the CCC Committee voted to place Dr. Adesanya on probation, citing thirteen different deficiencies that had suddenly presented themselves between December 12, 2025 — the date of Dr. Adesanya's last CCC evaluation — and January 13, 2026.

71. On February 3, 2026, Dr. Adesanya — *and the entire psychiatry department* — were presented with an official notice that the CCC had placed Dr. Adesanya on a "Corrective Action Plan/Probation (CAP)", effective immediately.

72. Specifically, the notice identified at least twelve different deficiencies, including, but not limited to, the following: an inability to communicate effectively, difficulty collaborating with other members of a patient's treatment team, a limited knowledge of psychopharmacology and diagnosis, a "contemptuous attitude," and lapses in professionalism.

73. The notice — which, again, was sent to the *entire department* — further disclosed Dr. Adesanya's confidential medical and mental health information and accused Dr. Adesanya of "splitting," a term associated with borderline personality disorder, despite Dr. Adesanya having no such diagnosis.

74. After receiving the notice, Dr. Adesanya immediately met with Dr. Klenzak regarding her probation decision. During this meeting, Dr. Klenzak admitted that "everything is subjective" and stated that he did not know why Dr. Adesanya had been placed on probation.[3]

75. When Dr. Adesanya inquired whether her probationary status had anything to do with her report about Defendant Fleishman's sexual assault, Dr. Klenzak laughed dismissively and told Dr. Adesanya to stop "demonizing" and "vilifying" Defendant Fleishman.

76. As a result of being placed on probation, Dr. Adesanya is unable to extend her contract with Defendant CCHS and has been unable to apply to other psychiatry residency programs.

---

[3] Dr. Adesanya found this response odd because the residency handbook provides that probation decisions are made by the program director, which, in this case, is Dr. Klenzak.

77.     If Dr. Adesanya is unable to complete her residency, she will be unable to obtain her full licensure from any medical board.

## COUNT I
**Discrimination Based on Sex**
**Title VII, 42 U.S.C. § 2000e-2(a)**
**(Against Defendant CCHS)**

78.     The allegations of paragraphs 1 through 77 are realleged and incorporated by reference as if fully set forth herein.

79.     Dr. Adesanya was an employee of Defendant CCHS, and Defendant CCHS was her employer, as those terms are defined in 42 U.S.C. § 2000e.

80.     Defendant Fleishman is an employee of Defendant CCHS and, during certain rotations, Dr. Adesanya's direct supervising physician.

81.     Dr. Adesanya belongs to a protected class — the female sex — as defined by Title VII.

82.     Dr. Adesanya was repeatedly sexually harassed by Defendant Fleishman on the basis of her sex.

83.     Dr. Adesanya did not solicit or invite the advances of Defendant Fleishman.

84.     Dr. Adesanya's reaction to this harassment affected tangible aspects of her employment, including, but not limited to, her probationary status and other privileges of employment with Defendant CCHS.

85.     Dr. Adesanya's report of Defendant Fleishman's sexual harassment was a cause of Defendant CCHS placing Dr. Adesanya on probation.

14

86. Defendant CCHS knew or should have known of Defendant Fleishman's harassment of Dr. Adesanya since Dr. Adesanya reported Defendant Fleishman's actions to Defendant CCHS's program director, Dr. Klenzak, and program coordinator, Ms. King.

87. As a direct and proximate result of the harassment based on her sex that was created by Defendant Fleishman and ratified by Defendant CCHS, Dr. Adesanya has suffered and will continue to suffer harm including, but not limited to, lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional distress, mental anguish, and other economic and non-economic damages.

88. Dr. Adesanya is entitled to and seeks all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief.

89. Dr. Adesanya also seeks and should be awarded her reasonable costs and attorneys' fees under 42 U.S.C. § 2000e-5(k), which she has been required to incur to prosecute this action.

**COUNT II**
**Retaliation**
**Title VII, 42 U.S.C. § 2000e, *et seq.***
**(Against Defendant CCHS)**

90. The allegations of paragraphs 1 through 89 are realleged and incorporated by reference as if fully set forth herein

91. Dr. Adesanya was an employee of Defendant CCHS, and Defendant CCHS was her employer, as those terms are defined in 42 U.S.C. § 2000e.

92. Defendant Fleishman is an employee of Defendant CCHS and, during certain rotations, Dr. Adesanya's direct supervising physician.

93. Dr. Adesanya engaged in a protected activity when she reported Defendant Fleishman's harassment on the basis of her sex.

94. Dr. Adesanya also engaged in a protected activity when she reported the patient safety concerns she observed during her Adolescent IP Psych rotation.

95. In retaliation for Dr. Adesanya's participation in these protected activities, Defendant CCHS placed Dr. Adesanya on probation.

96. There is a causal connection between Dr. Adesanya's protected activity and the materially adverse action taken against her by Defendant CCHS.

97. The retaliation endured by Dr. Adesanya would dissuade any reasonable employee from making complaints of discrimination and harassment or participating in an investigation of discrimination and harassment.

98. Defendant CCHS did not have a legitimate, non-discriminatory reason for placing Dr. Adesanya on probation.

99. The retaliatory conduct by Defendant CCHS against Dr. Adesanya constitutes a violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

100. As a direct and proximate result of the retaliatory conduct of her employer, Defendant CCHS, Dr. Adesanya has suffered and will continue to suffer harm including, but not limited to, lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional distress, mental anguish, and other economic and non-economic damages.

101. Dr. Adesanya seeks and is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief.

102. Dr. Adesanya also seeks and should be awarded her reasonable costs and attorneys' fees under 42 U.S.C. § 2000e-5(k), which she has been required to incur to prosecute this action.

## Count III
### Negligent Hiring, Supervision, and/or Retention
### (Against Defendant CCHS)

103. The allegations of paragraphs 1 through 102 are realleged and incorporated by reference as if fully set forth herein.

104. Defendant CCHS owed a legal duty of reasonable care to Dr. Adesanya and other employees at CFV Medical Center, including to provide Dr. Adesanya with a safe place to work, free from sexually assaultive behavior of its employees.

105. Defendant CCHS also owed a duty to Dr. Adesanya not to hire or retain an employee — such as Defendant Fleishman — that it knew or reasonably should have known had a propensity to use his authority as Dr. Adesanya's supervising physician to intimidate her and sexually harass her.

106. Defendant CCHS is liable for the tortious acts of an employee that it knew or should have known was unfit or incompetent.

17

107. Defendant Fleishman was an unfit or incompetent employee of Defendant CCHS, which Defendant CCHS knew or should have known when it chose to hire and/or retain him.

108. Defendant CCHS owed a further duty to properly supervise its employees, including Defendant Fleishman, by, *inter alia*, ensuring that supervising physicians cannot isolate a resident physician under their supervision and sexually harass her and intervening when it had knowledge that a supervising physician sexually harassed a resident physician.

109. Defendant CCHS breached this duty when it did not exercise reasonable care in the hiring, supervision, and/or retention of its employee, Defendant Fleishman.

110. Dr. Adesanya would not have been sexually harassed but for the negligence of Defendant CCHS is hiring and retaining Defendant Fleishman and/or failing to properly supervise Defendant Fleishman.

111. As a result, any tortious acts that were committed by Defendant Fleishman against Dr. Adesanya in the workplace — and the resultant injuries to Dr. Adesanya — were the proximate and foreseeable result of such negligent hiring, supervision, and retention of Defendant Fleishman.

112. As a direct and proximate result of Defendant CCHS's breach of its duties, Defendant Fleishman sexually harassed Dr. Adesanya, causing her severe emotional distress, including, but not limited to, anxiety, fear, humiliation, embarrassment, depression, low self-esteem, and loss of enjoyment in life.

113. Dr. Adesanya's injuries were the reasonably foreseeable result of Defendant CCHS's breach of its duties owed to Dr. Adesanya.

114. Dr. Adesanya seeks and is entitled to actual and compensatory damages for the severe mental and emotional distress that she experienced during and because of her employment in an amount to be determined by a jury but, in any event, in excess of $25,000.00.

## COUNT IV
### Negligence – Ratification
### (Against Defendant CCHS)

115. The allegations of paragraphs 1 through 114 are realleged and incorporated by reference as if fully set forth herein.

116. An employer who ratifies the tortious conduct of its employees, even by omission to act, is liable for such conduct.

117. Defendant CCHS was, at all relevant times, Defendant Fleishman's employer.

118. Defendant CCHS acted negligently in failing to take reasonable corrective measures after it was made aware of Defendant Fleishman's sexual harassment and discrimination based on sex.

119. Defendant CCHS's failures to address Defendant Fleishman's misconduct constitute ratification of such conduct.

120. Dr. Adesanya seeks and is entitled to actual and compensatory damages for the severe mental and emotional distress that she experienced during and because of her employment in an amount to be determined by a jury but, in any event, in excess of $25,000.00.

**COUNT V**
**ASSAULT**
**(Against Defendant Fleishman)**

121.    The allegations of paragraphs 1 through 120 are realleged and incorporated by reference as if fully set forth herein.

122.    Defendant Fleishman has individually committed the tort of assault upon Dr. Adesanya.

123.    As described herein, Defendant Fleishman showed the intent to cause apprehension of an imminent offensive or harmful contact when he forced Dr. Adesanya into a supply closet and blocked her only exit.

124.    As a direct and proximate result of this apprehension of unwanted physical contact, Dr. Adesanya has suffered and continues to suffer severe emotional distress, including, but not limited to, anxiety, depression, humiliation, embarrassment, low self-esteem, and loss of enjoyment of life.

125.    Dr. Adesanya has required treatment from mental health professionals and medication to treat her severe and ongoing emotional distress.

126.    Dr. Adesanya seeks and is entitled to actual and compensatory damages for the physical damages and severe mental and emotional distress that she experienced because of the assault upon her by Defendant Fleishman in an amount to be determined by a jury but, in any event, in excess of $25,000.00.

**<u>COUNT VI</u>**
**Intentional Infliction of Emotional Distress**
**(Against Defendant Fleishman)**

127. The allegations of paragraphs 1 through 126 are realleged and incorporated by reference as if fully set forth herein.

128. Defendant Fleishman's conduct as described herein was extreme, outrageous, and exceeded the bounds of civil society.

129. Defendant Fleishman acted intentionally and/or with reckless indifference to the likelihood that his conduct would cause Dr. Adesanya to suffer severe emotional distress.

130. The intentional and/or recklessly indifferent actions of Defendant Fleishman did, in fact, cause Dr. Adesanya to suffer severe emotional distress, including, but not limited to, anxiety, depression, humiliation, embarrassment, low self-esteem, and loss of enjoyment of life.

131. Dr. Adesanya has required treatment from mental health professionals and medication to treat her severe and ongoing emotional distress.

132. Dr. Adesanya seeks and is entitled to actual and compensatory damages for the severe mental and emotional distress that she experienced because of her the conduct of Defendant Fleishman described herein in an amount to be determined by a jury but, in any event, in excess of $25,000.00.

21

**COUNT VII**
**Negligent Infliction of Emotional Distress**
**(Against Defendant CCHS)**

133. The allegations of paragraphs 1 through 132 are realleged and incorporated by reference as if fully set forth herein.

134. Defendant CCHS has negligently inflicted upon Dr. Adesanya severe emotional distress.

135. As described *supra*, Defendant CCHS owed Dr. Adesanya a duty of reasonable care when she was employed with Defendant CCHS, including to provide her with a safe working environment free from harassment.

136. Defendant CCHS breached this duty when it did not exercise reasonable care in responding appropriately to Dr. Adesanya's report of Defendant Fleishman's sexual harassment.

137. Dr. Adesanya's severe mental and emotional distress was the reasonably foreseeable result of Defendant CCHS's breach of its duty of care to Dr. Adesanya.

138. The negligence of Defendant CCHS did, in fact, cause Dr. Adesanya to suffer severe emotional distress, including, but not limited to, anxiety, depression, humiliation, embarrassment, low self-esteem, and loss of enjoyment of life.

139. Dr. Adesanya has required treatment from mental health professionals and medication to treat her severe and ongoing emotional distress.

140. Dr. Adesanya seeks and is entitled to actual and compensatory damages for the severe mental and emotional distress that she experienced during and because of her

22

employment in an amount to be determined by a jury but, in any event, in excess of $25,000.00.

**COUNT VIII**
**Libel *Per Se***
**(Against Defendant CCHS)**

141. The allegations of paragraphs 1 through 140 are realleged and incorporated by reference as if fully set forth herein.

142. Defendant CCHS's actions described herein constitute publication of false and defamatory statements and information about Dr. Adesanya to third persons — namely, the psychiatry department at CFV Medical Center.

143. Specifically, Defendant CCHS wrote and possessed in written form a statement reflecting that Dr. Adesanya had developed over twelve deficiencies various learning milestones in her residency program when, one month prior, Defendant CCHS had evaluated Dr. Adesanya as having possessed no relative deficiencies in her learning milestones.

144. Defendant published this statement knowing it was false.

145. Defendant's statement constitutes libel *per se* in that it impeached Dr. Adesanya in her trade or profession as the statement specifically addresses and impugns Dr. Adesanya's capacity as a resident physician.

146. This libel *per se* is ongoing in nature, and Defendant continues to refuse to correct or rescind the libelous probation notice.

23

147. As a direct and proximate result of Defendant's libelous statement, Dr. Adesanya has been denied an extension of her contract with Defendant CCHS and has been denied the opportunity to transfer to a different residency program.

148. As a direct and proximate result of Defendant's libelous statement, Dr. Adesanya was suffered damages, including, but not limited to, past and future lost wages, anxiety, embarrassment, loss of career, damage to reputation and career, mental anguish, loss of enjoyment of life, and other economic and non-economic harms.

149. As a direct and proximate result of Defendant's libelous statement, Dr. Adesanya is entitled to all legal and equitable remedies available for Defendant's libel *per se* of her in an amount to be determined by a jury, which in any event exceeds $25,000.00.

## COUNT IX
### Libel
### (Against Defendant CCHS)

150. The allegations of paragraphs 1 through 149 are realleged and incorporated by reference as if fully set forth herein.

151. Defendant CCHS's actions described herein constitute publication of false and defamatory statements and information about Dr. Adesanya to third persons — namely, the entire psychiatry department at CFV Medical Center.

152. Specifically, Defendant CCHS wrote and possessed in written form a statement reflecting that Dr. Adesanya had developed over twelve deficiencies various learning milestones in her residency program when, one month prior, Defendant CCHS

24

had evaluated Dr. Adesanya as having possessed no relative deficiencies in her learning milestones.

153. Defendant CCHS published this statement knowing it was false.

154. Defendant CCHS's statement was intended to impeach, prejudice, discredit, and/or reflect unfavorably upon Dr. Adesanya in her trade or profession as a physician, as being placed on probation has an immediate effect on Dr. Adesanya's ability to complete her residency training and become a fully licensed physician.

155. Defendant CCHS's statement was intended to subject Dr. Adesanya to ridicule, contempt, and/or disgrace.

156. The libel is ongoing in nature, and Defendant CCHS continues to refuse to correct or rescind the libelous statement.

157. As a direct and proximate result of Defendant's libelous statement, Dr. Adesanya has been denied an extension of her contract with Defendant CCHS and has been denied the opportunity to transfer to a different residency program.

158. As a direct and proximate result of Defendant's libelous statement, Dr. Adesanya was suffered damages, including, but not limited to, past and future lost wages, anxiety, embarrassment, loss of career, damage to reputation and career, mental anguish, loss of enjoyment of life, and other economic and non-economic harms.

159. As a direct and proximate result of Defendant's libelous statement, Dr. Adesanya is entitled to all legal and equitable remedies available for Defendant's libel of her in an amount to be determined by a jury, which in any event exceeds $25,000.00.

25

**COUNT X**
**Breach of Covenant of Good Faith and Fair Dealing**
**(Against Defendant CCHS)**

160. The allegations of paragraphs 1 through 159 are realleged and incorporated by reference as if fully set forth herein.

161. By virtue of the contractual employment relationship between Dr. Adesanya and Defendant CCHS, Defendant CCHS had an implied duty of good faith and fair dealing to Dr. Adesanya.

162. Defendant CCHS breached its duty of good faith and fair dealing to Dr. Adesanya by falsely and improperly placing Dr. Adesanya on probation.

163. As a direct and proximate result of Defendant's breach, Dr. Adesanya has been denied employment opportunities — of which Defendant CCHS was aware — including, but not limited to, revocation of an employment offer with Northwest Medical Center in Tucson, Arizona, and revocation of an employment offer with Adventist Health White Memorial in Los Angeles, California.

164. As a direct and proximate result of Defendant's breach, Dr. Adesanya has suffered damages, including, but not limited to, denial of employment opportunities, past and future lost wages, anxiety, embarrassment, loss of career, damage to reputation and career, mental anguish, loss of enjoyment of life, and other economic and non-economic harms.

165. Dr. Adesanya seeks and is entitled to all legal and equitable remedies available for Defendant's breach of the covenant of good faith and fair dealing in an amount to be determined by a jury, which in any event exceeds $25,000.00.

26

<u>**COUNT XI**</u>
**Tortious Interference with Prospective Economic Advantage**
**(Against Defendant CCHS)**

166.   The allegations of paragraphs 1 through 165 are realleged and incorporated by reference as if fully set forth herein.

167.   Dr. Adesanya expected to establish a business relationship with prospective psychiatry residency programs.

168.   Defendant CCHS was aware that Dr. Adesanya could or would seek employment with other psychiatry residency programs.

169.   Defendant CCHS intentionally interfered with these potential relationships by making the libelous statement described herein.

170.   Such interference was improper.

171.   As a direct and proximate result, Dr. Adesanya has been unable to obtain other employment and continued to be denied job placement as a psychiatry resident.

172.   As a direct and proximate result of Defendant's breach, Dr. Adesanya has been denied employment opportunities — of which Defendant CCHS was aware — including, but not limited to, revocation of an employment offer with Northwest Medical Center in Tucson, Arizona, and revocation of an employment offer with Adventist Health White Memorial in Los Angeles, California.

173.   As a direct and proximate result of Defendant CCHS's tortious conduct, Dr. Adesanya will also be unable to obtain full licensure by the North Carolina Medical Board, making future business opportunities increasingly and exceedingly more difficult to secure.

174. As a direct and proximate result of Defendant CCHS's actions, Dr. Adesanya has suffered damages, including, but not limited to, past and future lost wages, reputational and professional damages, loss of enjoyment of life, and other economic and non-economic damages.

175. Dr. Adesanya seeks and is entitled to all legal and equitable remedies available for Defendant CCHS's tortious interference with prospective economic advantages in an amount to be determined by a jury but, in any event, in excess of $25,000.00.

## COUNT XII
### Punitive Damages
### (Against All Defendants)

176. The allegations of paragraphs 1 through 175 are realleged and incorporated by reference as if fully set forth herein.

177. The conduct of Defendants described herein constitutes willful and wanton conduct and reckless disregard of Dr. Adesanya's rights and was without provocation, legal justification, or any excuse.

178. Defendant CHHS, by and through its managers and officers as described herein, knowingly participated in and condoned such conduct.

179. As such, punitive damages should be awarded against Defendants to deter other potential actors from committing similar wrongful acts.

28

180. Dr. Adesanya seeks and is entitled to recover punitive damages against Defendants in the full amount permitted under the law: three times compensatory damages or $250,000.00, whichever is greater.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Olubusayo Adesanya, M.D., requests that this Court enter judgment in her favor and against all Defendants, jointly and severally, and further:

1. Award Dr. Adesanya compensatory damages to be determined by a jury, plus demonstrated past and future pecuniary damages on each of the above-stated counts;

2. Award Dr. Adesanya punitive and exemplary damages in an amount to be determined by a jury on each of the above-stated counts;

3. Award Dr. Adesanya appropriate past and future lost income;

4. Award Dr. Adesanya attorneys' fees and costs of this action as allowable by law;

5. Tax the prejudgment interest of the damages, attorneys' fees and costs of this action to the Defendants, as of the date of the filing of this Complaint; and

6. Award Dr. Adesanya such other and further relief this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury with respect to each claim in this Complaint.

29

This the 29th day of May, 2026.          Respectfully submitted,

/s/ Catharine E. Edwards
Catharine E. Edwards
N.C. State Bar No. 52705
cee@eblaw.com
Alison E. Smith
N.C. State Bar No. 61856
aes@eblaw.com
P.O. Box 6759
Raleigh, NC 27628
(T) 919-636-5100

*Attorneys for Plaintiff*

30