IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:26-cv-00368-FL

| | | |
|---|---|---|
| OLUBUSAYO ADESANYA, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ANSWER AND COUNTERCLAIM** |
| CUMBERLAND COUNTY HOSPITAL | ) | |
| SYSTEM, INC. and KENNETH | ) | |
| FLEISHMAN, M.D., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Defendants Cumberland County Hospital Systems, Inc. ("CCHS") and Kenneth Fleishman, M.D. ("Fleishman") (collectively "Defendants"), by and through counsel, responding to the allegations contained in Plaintiff's Complaint (the "Complaint") [D.E. 1], allege and say that:

## INTRODUCTION

1.      Admitted, upon information and belief.

2.      The allegations of Paragraph 2 are legal conclusions to which no response from Defendants are required. To the extent that a response is required, Defendants deny the allegations of Paragraph 2.

## PARTIES

3.      Admitted, upon information and belief.

4.      Admitted.

5.      Admitted.

6.      Admitted.

7.      Admitted.

8.      Admitted.

<u>**JURISDICTION, VENUE, AND CONDITIONS PRECEDENT**</u>

9.      Admitted.

10.     Admitted.

11.     Admitted.

12.     Admitted.

13.     Defendants admit that venue is proper in this District. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 13.

14.     Defendants admit that on or about February 13, 2026, Plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"), with the Charge No. 433-2026-01608, alleging violations of Title VII. Except as expressly admitted herein, Defendant denies the allegations of Paragraph 14.

15.     Admitted.

16.     The allegations of Paragraph 16 are legal conclusions to which no response from Defendants are required. To the extent that a response is required, Defendants deny the allegations of Paragraph 16.

<u>**FACTUAL ALLEGATIONS**</u>

**Background**

17.     Admitted, upon information and belief.

18.     Defendants admit that Plaintiff transferred to CCHS's psychiatry residency program to pursue psychiatry following a year of residency in Family Medicine at Atrium

Health Floyd Medical Center. Except as expressly admitted herein, Defendant deny the remaining allegations of Paragraph 18.

19. Admitted.

20. CCHS admits that Plaintiff entered CCHS's psychiatry program as a second-year resident.

21. Denied.

22. Admitted, upon information and belief.

23. Admitted.

24. Admitted.

25. Admitted.

26. Defendants admit that Plaintiff's Postgraduate Training Agreement is in writing and speaks for itself. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 26.

27. Defendants lack knowledge or information sufficient to form a belief regarding the allegations of Paragraph 27, and therefore deny the same.

28. Admitted.

29. Defendants admit that Plaintiff's evaluations are in writing and speak for themselves. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 29.

30. Admitted.

31. Defendants admit that Plaintiff's evaluations are in writing and speak for themselves. Except as expressly admitted herein, Defendants deny the allegations of

Paragraph 31.

32.     Defendants admit that Plaintiff's evaluations are in writing and speak for themselves. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 32.

33.     Defendants admit that Plaintiff's evaluations are in writing and speak for themselves. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 33.

34.     Defendants admit that Plaintiff's evaluations are in writing and speak for themselves. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 34.

35.     Defendants admit that Plaintiff's evaluations are in writing and speak for themselves. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 35.

36.     Defendants admit that Plaintiff's evaluations are in writing and speak for themselves. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 36.

### Dr. Adesanya First Experiences Sexual Harassment

37.     Denied.

38.     Denied.

39.     Denied.

40.     Denied.

41.     Denied.

42.    Denied.

43.    Defendants lack knowledge or information sufficient to form a belief regarding the allegations of Paragraph 43 as they are based on Plaintiff's beliefs, and therefore deny the same.

44.    Denied.

### Dr. Adesanya's CCC Evaluation

45.    Admitted.

46.    Defendants admit that Plaintiff's evaluations are in writing and speak for themselves. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 46.

47.    Defendants admit that Plaintiff's evaluations are in writing and speak for themselves. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 47.

48.    Defendants admit that Plaintiff's evaluations are in writing and speak for themselves. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 48.

### Dr. Adesanya's Adolescent IP Psych Rotation and Second Episode of Sexual Harassment

49.    Admitted.

50.    Admitted.

51.    Defendants explicitly deny that Plaintiff ever reported any complaints against Dr. Fleishman. Except as expressly admitted herein, Defendants deny the allegations of

Paragraph 51.

52. Defendants explicitly deny that Dr. Fleishman assaulted Plaintiff. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 52.

53. Denied.

54. Denied.

55. Denied.

56. Denied.

57. Defendants explicitly deny that Dr. Fleishman made any of the purported allegations within Paragraph 57. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 57.

58. Denied.

59. Denied.

60. Denied.

61. Defendants admit that Plaintiff's evaluations are in writing and speak for themselves. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 61.

62. Defendants admit that Plaintiff's evaluations are in writing and speak for themselves. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 62.

### Dr. Adesanya's Report of Patient Safety Concerns

63. Denied.

64. Denied.

65. Defendants admit that the email referenced in Paragraph 65 is in writing and speaks for itself. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 65.

66. Defendants admit that the email referenced in Paragraph 66, including all subparagraphs, is in writing and speaks for itself. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 66, including all subparagraphs.

67. Denied.

68. Defendants admit that around October 2008, CFV Medical Center was placed on "immediate jeopardy" status following a CMS survey. CMS subsequently determined that the Medical Center had returned to substantial compliance by January 27, 2009. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 68.

**Retaliation Against Dr. Adesanya**

69. Defendants admit that Plaintiff was pulled from her Adolescent IP Psych rotation because Plaintiff was involved in a Human Resources investigation regarding complaints made against her. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 69.

70. Defendants admit that on January 13, 2026, the CCC Committee placed Plaintiff on probation due to her performance. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 70.

71. Defendants admit that the Corrective Action Plan is in writing and speaks for itself. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 71.

72. Defendants admit that the Corrective Action Plan is in writing and speaks for itself. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 72.

73. Defendants admit that the "Corrective Action Plan/Probation (CAP)" is in writing and speaks for itself. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 73.

74. Defendants admit that Dr. Klenzak and Ms. King met with Plaintiff following the CCC Committee's decision to issue the Corrective Action Plan/Probation (CAP). Except as expressly admitted herein, Defendants deny the allegations of Paragraph 74.

75. Denied.

76. Denied.

77. Defendants lack knowledge or information sufficient to form a belief regarding the allegations of Paragraph 77, and therefore denies the same.

## COUNT I
### Discrimination Based on Sex Title VII, 42 U.S.C. § 2000e-2(a)
### (Against Defendant CCHS)

78. Defendant realleges and incorporates by reference all preceding paragraphs of this Answer.

79. Admitted.

80. Admitted.

81. Admitted, upon information and belief.

82. Denied.

83. Defendant denies that Dr. Fleishman made any advances upon Plaintiff.

Except as expressly admitted herein, Defendant denies the allegations of Paragraph 83.

84. Denied.

85. Denied.

86. Denied.

87. Denied.

88. Denied.

89. Denied.

**COUNT II**
**Retaliation Title VII, 42 U.S.C. § 2000e,** *et seq.*
**(Against Defendant CCHS)**

90. Defendant realleges and incorporates by reference all preceding paragraphs of this Answer.

91. Admitted.

92. Admitted.

93. Denied.

94. Denied.

95. Denied.

96. Denied.

97. Defendant denies engaging in any retaliatory conduct toward Plaintiff.

98. Denied.

99. Defendant denies engaging in any retaliatory conduct toward Plaintiff.

100. Denied.

101. Denied.

102.   Denied.

## Count III
### Negligent Hiring, Supervision, and/or Retention
### (Against Defendant CCHS)

103.   Defendant realleges and incorporates by reference all preceding paragraphs of this Answer.

104.   The allegations of Paragraph 104 are conclusions and/or recitations of law to which no response is required. To the extent that a response is required, Defendant denies the allegations.

105.   The allegations of Paragraph 105 are conclusions and/or recitations of law to which no response is required. To the extent that a response is required, Defendant denies the allegations.

106.   Denied.

107.   Denied.

108.   The allegations of Paragraph 108 are conclusions and/or recitations of law to which no response is required. To the extent that a response is required, Defendant denies the allegations.

109.   Denied.

110.   Defendant denies that Plaintiff was sexually harassed.

111.   Denied.

112.   Denied.

113.   Denied.

114.   Denied.

**COUNT IV**
**Negligence – Ratification**
**(Against Defendant CCHS)**

115. Defendant realleges and incorporates by reference all preceding paragraphs of this Answer.

116. The allegations of Paragraph 116 are conclusions and/or recitations of law to which no response is required. To the extent that a response is required, Defendant denies the allegations.

117. Admitted.

118. Denied.

119. Denied.

120. Denied.

**COUNT V**
**ASSAULT**
**(Against Defendant Fleishman)**

121. Defendant realleges and incorporates by reference all preceding paragraphs of this Answer.

122. Denied.

123. Denied.

124. Denied.

125. Denied.

126. Denied.

**COUNT VI**
**Intentional Infliction of Emotional Distress**
**(Against Defendant Fleishman)**

127. Defendant realleges and incorporates by reference all preceding paragraphs of this Answer.

128. Denied.

129. Denied.

130. Denied.

131. Denied.

132. Denied.

## COUNT VII
### Negligent Infliction of Emotional Distress
### (Against Defendant CCHS)

133. Defendant realleges and incorporates by reference all preceding paragraphs of this Answer.

134. Denied.

135. The allegations of Paragraph 135 are conclusions and/or recitations of law to which no response is required. To the extent that a response is required, Defendant denies the allegations.

136. Denied.

137. Denied.

138. Denied.

139. Denied.

140. Denied.

**COUNT VIII**
**Libel *Per Se***
**(Against Defendant CCHS)**

141. Defendant realleges and incorporates by reference all preceding paragraphs of this Answer.

142. Denied.

143. Denied.

144. Denied.

145. Denied.

146. Denied.

147. Denied.

148. Denied.

149. Denied.

**COUNT IX**
**Libel**
**(Against Defendant CCHS)**

150. Defendant realleges and incorporates by reference all preceding paragraphs of this Answer.

151. Denied.

152. Denied.

153. Denied.

154. Denied.

155. Denied.

156. Denied.

157.   Denied.

158.   Denied.

159.   Denied.

## COUNT X
### Breach of Covenant of Good Faith and Fair Dealing
### (Against Defendant CCHS)

160.   Defendant realleges and incorporates by reference all preceding paragraphs of this Answer.

161.   The allegations of Paragraph 161 are conclusions and/or recitations of law to which no response is required. To the extent that a response is required, Defendant denies the allegations.

162.   Denied.

163.   Denied.

164.   Denied.

165.   Denied.

## COUNT XI
### Tortious Interference with Prospective Economic Advantage
### (Against Defendant CCHS)

166.   Defendant realleges and incorporates by reference all preceding paragraphs of this Answer.

167.   Denied.

168.   Defendant CCHS is aware that Plaintiff was exploring opportunities with other residency programs. Except as expressly admitted herein, Defendants deny the allegations of Paragraph 168.

169.    Denied.

170.    Defendant denies interfering with any potential relationships.

171.    Denied.

172.    Denied.

173.    Denied.

174.    Denied.

175.    Denied.

**COUNT XII**
**Punitive Damages**
**(Against All Defendants)**

176.    Defendants reallege and incorporate by reference all preceding paragraphs of their Answer.

177.    Denied.

178.    Denied.

179.    Denied.

180.    Denied.

**PLAINTIFF'S PRAYER FOR RELIEF**

The allegations contained in Plaintiff's Prayer for Relief are conclusions and /or recitations of law to which no response is required. To the extent that a response is required, Defendants deny the allegations contained in Plaintiff's Prayer for Relief. Defendants specifically deny that Plaintiff is entitled to any of the relief sought.

<h3 style="text-align:center">RESERVATION OF RIGHTS</h3>

Defendants hereby reserve the right to assert, and does not waive, any additional or further defenses as may be revealed by additional information acquired during discovery or otherwise and reserves the right to amend this Answer to assert any such defenses.

<h3 style="text-align:center">FIRST AFFIRMATIVE DEFENSE</h3>

Plaintiff's Complaint should be dismissed, in whole or in part, to the extent it fails to state a claim upon which relief can be granted.

<h3 style="text-align:center">SECOND AFFIRMATIVE DEFENSE</h3>

To the extent Plaintiff failed to comply with any statutory prerequisites, Plaintiff's claims in this action are barred.

<h3 style="text-align:center">THIRD AFFIRMATIVE DEFENSE</h3>

Plaintiff's claims are barred, in whole or in part, to the extent they exceed the scope of or are inconsistent with the Charges of Discrimination she filed with the EEOC.

<h3 style="text-align:center">FOURTH AFFIRMATIVE DEFENSE</h3>

All events which occurred more than one hundred eighty (180) days prior to the filing of Plaintiff's Charges of Discrimination are untimely and are not properly assertable in this action; nor is Plaintiff entitled to relief in this action for any events which occurred more than one hundred eighty (180) days prior to her EEOC charges.

<h3 style="text-align:center">FIFTH AFFIRMATIVE DEFENSE</h3>

To the extent Plaintiff's claims seek to address alleged acts or omissions beyond the applicable statute of limitations, such claims are barred.

## SIXTH AFFIRMATIVE DEFENSE

Any and all actions taken with regard to Plaintiff's employment were based on legitimate, non-discriminatory reasons, were justified and were not contrary to any public policy or otherwise unlawful.

## SEVENTH AFFIRMATIVE DEFENSE

The employment practices of Defendants are now, and were at all relevant times, conducted in accordance with any and all applicable local, state and federal laws and regulations.

## EIGHTH AFFIRMATIVE DEFENSE

To the extent Plaintiff establishes an impermissible motivating factor for any employment decision challenged, which is denied, the same action would have been taken in the absence of such impermissible motivating factor.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff had and continues to have the ability to mitigate damages and, to the extent that mitigation has not occurred, Defendants plead failure to mitigate as a full or partial bar to Plaintiff's recovery.

## TENTH AFFIRMATIVE DEFENSE

To the extent after-acquired evidence exists of any wrongdoing by Plaintiff, Plaintiff is barred from recovering any back pay for any period after the date of discovery of such evidence.

## ELEVENTH AFFIRMATIVE DEFENSE

To the extent it may be found that Plaintiff was subjected to any of the conduct alleged in the Complaint, which Defendant denies, such conduct was not willful and was contrary to the good faith efforts of Defendants to comply with the federal and state anti-discrimination laws. Consequently, any claim for liquidated or punitive damages is barred.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims may be barred, in whole or in part, by the doctrines of waiver, estoppel and/or unclean hands.

## THIRTEENTH AFFIRMATIVE DEFENSE

Defendants complied with their obligations under applicable state and federal law to provide a reasonable accommodation in the workplace absent an undue hardship.

## FOURTEENTH AFFIRMATIVE DEFENSE

To the extent that any employee of defendant may be found to have engaged in any behavior alleged in the complaint, which is denied, defendant is not liable for such conduct because it was outside the course and scope of employment with defendant and was neither condoned nor ratified by defendant.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims may be barred in whole or in part due to workers compensation exclusivity.

## SIXTEENTH AFFIRMATIVE DEFENSE

Defendants exercised reasonable care to prevent and correct promptly any alleged harassing behavior and plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by defendant or to avoid harm otherwise.

## RESERVATION OF RIGHTS

Defendants hereby reserve the right to assert, and do not waive, any additional or further defenses as may be revealed by additional information acquired during discovery or otherwise and reserves the right to amend this Answer to Plaintiff's Amended Complaint to assert any such defenses.

## COUNTERCLAIM

Pursuant to Federal Rule of Civil Procedure 13, Defendants/Counterclaim-Plaintiffs Cumberland County Hospital Systems, Inc. ("CCHS") and Kenneth Fleishman, M.D. ("Fleishman") (collectively "Counterclaim-Plaintiffs") countersue Plaintiff/Counterclaim-Defendant Olubusayo Adesanya, M.D. ("Dr. Adesanya").

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Olubusayo Adesanya, M.D. ("Dr. Adesanya") is a citizen and resident of Cumberland County, North Carolina.

2. CCHS is a North Carolina corporation with its principal place of business in Fayetteville, Cumberland County, North Carolina.

3. At all times relevant herein, CCHS did business as Cape Fear Valley Health Systems, Cape Fear Valley Health, Cape Fear Valley Behavioral Health Care, and/or Cape Fear Valley Medical Center.

4. Dr. Fleishman is a citizen and resident of Cumberland County, North Carolina.

5. This Court has supplemental jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1367.

6. Venue is proper in this District.

7. Personal jurisdiction exists on the basis that Dr. Adesanya has purposefully availed herself of the laws of the State of North Carolina through her actions as set forth herein. Accordingly, this Court has specific jurisdiction over Dr. Adesanya for the purposes of this Counterclaim and the unlawful conduct alleged herein.

## FACTUAL ALLEGATIONS

8. Following completion of medical school, Dr. Adesanya began her residency training in Family Medicine at Atrium Health Floyd Medical Center in Rome, Georgia.

9. After one year of her Family Medicine residency, Dr. Adesanya transferred to the psychiatry residency program at CCHS (the "Program").

10. Upon entering the Program, CCHS credited Dr. Adesanya's prior residency experience such that she could enter as a second-year psychiatry resident rather than restarting as a first-year psychiatry resident, and thus, she started as a Post-Graduate Year 2 ("PGY-2").

11. Dr. Adesanya began working for CCHS as a psychiatric resident in the Program starting on June 16, 2025.

12. Dr. Adesanya was employed with CCHS pursuant to a Postgraduate Training Agreement (the "Agreement"), which provided employment for a one-year term through June 30, 2026.

13. The Agreement could be extended beyond the one-year term if it were renewed or extended in writing by CCHS.

14. The Program aims to provide a graduate medical education that meets the standards established by accreditation bodies such as the Accreditation Council for Graduate Medical Education ("ACGME").

15. In recognition of the Program's efforts to provide a graduate medical education that meets accreditation standards, it is incumbent on the residents to provide the necessary effort to perform at or above a satisfactory level in the Program.

16. To accomplish this, residents within the Program have their performance evaluated regularly with periodic feedback being provided.

17. Upon entering the Program, Dr. Adesanya completed the standard Program and Graduate Medical Education ("GME") orientations with onboarding PGY-1 (first-year) residents.

18. During those orientation sessions, Dr. Adesanya, along with all the other residents, had multiple sessions on program functioning and expectations, GME and CCHS policies and procedures, including review of the Program manual.

19. Those sessions and the manual outlined the Program's zero-tolerance policy and resident and faculty expectations, including the complaint/grievance procedures, the ability to report complaints anonymously, and the non-retaliation policy.

20. During her time in the Program, Dr. Adesanya received performance evaluations, counseling, coaching, and feedback concerning her clinical performance, professionalism, communication, and interactions with faculty, staff, and fellow residents, as contemplated by the Agreement and the Program's policies and procedures.

21. The Program documented multiple concerns relating to performance deficiencies and professionalism issues during Dr. Adesanya's tenure with the Program.

22. These documented concerns were similar to the professionalism and communication concerns that the program director at Dr. Adesanya's first residency program disclosed to CCHS during Dr. Adesanya's onboarding process and during her application process for her resident training license for the North Carolina Medical Board.

23. CCHS was aware that prior to joining the Program, Dr. Adesanya had previously completed a remediation plan to address those professionalism and communication concerns raised in her first residency program.

24. The remediation plan noted a number of areas where Dr. Adesanya was not performing at the expected level, including practice-based learning and improvement, professionalism, and interpersonal and communication skills.

25. The Program did not share this information concerning Dr. Adesanya's documented, preexisting communication and interpersonal issues with the Program faculty, so as not to create any preconceived predispositions against Dr. Adesanya.

26. Unfortunately, during Dr. Adesanya's first few rotations within the Program, similar issues arose with her professionalism and communication in the Program.

27.     In particular, Dr. Adesanya struggled in the critical areas of faculty supervision, interpersonal and interprofessional communication, and receiving feedback.

28.     Dr. Adesanya also had negative interactions with staff, other residents, and team members, which was evidenced by staff members making complaints about Dr. Adesanya being disruptive, condescending, and unprofessional towards them in her communications.

29.     Dr. Scott Klenzak (the Program Director) and Ms. Arielle King (the Program Administrator) met with Dr. Adesanya several times to address the concerns the Program had observed regarding Dr. Adesanya's professionalism and communication issues.

30.     Despite repeated conversations and attempts by the Program leadership to address these issues with Dr. Adesanya early on, the Program still had ongoing concerns regarding her continued deficiencies in the areas of supervision, interpersonal communication, and professionalism.

31.     On November 15, 2025, Dr. Adesanya received her 2025 Fall Clinical Competency Committee ("CCC") evaluation, which reflected several areas for improvement, including notetaking, efficiency, receiving feedback, interacting with teammates, and becoming overly involved with patients.

32.     Over the next few months, Dr. Adesanya continued to exhibit performance issues related to presenting cases, becoming overly involved in her cases to the point of crossing physician/patient boundaries, being inflexible in her understanding when attendings offered her feedback on her performance and clinical skills, among other issues, while the communication and professionalism concerns continued.

33. On January 2, 2026, Dr. Adesanya was involved in an incident with a member of CCHS's social work team during her rotation in CCHS's Adolescent Inpatient Unit.

34. Specifically, members of CCHS's social work team reported that Dr. Adesanya was making snide comments that were insulting, and made in a mocking manner.

35. As a result of the incident, the member of CCHS's social work team, as well as the Adolescent Inpatient Unit Recreation Therapist, and the Occupational Therapist, all filed formal complaints with CCHS's Human Resources ("HR") Department regarding Dr. Adesanya's interactions with the social work team.

36. Their complaints noted that Dr. Adesanya engaged in unprofessional communications and demeaning interactions with members of the social work team.

37. Further, the complaints noted that Dr. Adesanya overstepped her bounds as a medical resident by interfering with a treatment plan recommended by a social-work healthcare professional.

38. Dr. Adesanya's interactions within the Adolescent Inpatient Unit were so concerning that she had to be pulled early from the rotation and reassigned to the Emergency Department crisis service, because it had resulted in an active HR investigation.

39. On January 13, 2026, the Program's CCC conducted a meeting to review Dr. Adesanya's work and progress since their previous meeting on December 12, 2025.

40. During this meeting, the CCC identified multiple concerns about Dr. Adesanya's performance and communication deficiencies, which persisted across multiple of her rotations, including Psychiatry, Neurology, and Consults, and attending physicians.

Consequently, the CCC ultimately voted to place Dr. Adesanya on a Corrective Action Plan/Probation due to the seriousness of her behavior and regression in meeting established, generally applicable resident milestones.

41. The CCC issued the Corrective Action Plan/Probation ("CAP") to Dr. Adesanya on February 3, 2026, consistent with Program policies and ACGME requirements.

42. The CAP outlined at least twelve (12) areas of concern where Dr. Adesanya was not meeting expectations.

43. Pursuant to the CAP, Dr. Adesanya was also placed on probation for 90 days, starting on February 3, 2026, with the CCC to meet again in May 2026 to evaluate Dr. Adesanya's progress.

44. At the time the CAP was issued to Dr. Adesanya, it did not constitute a final action, as the Program's Sponsoring Institution Handbook provided for an appeals process that would allow Dr. Adesanya to appeal the probation decision if she chose to do so.

45. On February 11, 2026, Dr. Adesanya also received a verbal written warning and corrective action, after CCHS's HR Department substantiated the complaints filed by the social worker, as well as those filed by the Adolescent Inpatient Unit Recreation Therapist and Occupational Therapist, regarding her behavior and team interactions, including Dr. Adesanya's intimidating and bullying behavior tied to the incident involving a member of CCHS's social work team.

46. On February 17, 2026, Dr. Adesanya submitted a grievance seeking to appeal the issuance of the CAP.

47. On February 25, 2026, Dr. Adesanya requested and began a medical leave of absence.

48. Prior to going out on leave, Dr. Adesanya requested a letter of recommendation from Dr. Klenzak to explore transferring back to a Family Medicine residency program, which Dr. Klenzak promptly provided to her.

49. While Dr. Adesanya was on leave, CCHS was contacted by legal counsel retained by Dr. Adesanya and initiated conversations to discuss options for Dr. Adesanya continuing her graduate medical education elsewhere, despite CCHS having no intention of terminating Dr. Adesanya's employment; instead, CCHS sought to work with Dr. Adesanya to help her succeed in the Program or assist with her transfer to another graduate medical program if that was her desire.

50. During these conversations, CCHS informed Dr. Adesanya's counsel that because the CAP did not constitute a final action, there would be no reportable action against Dr. Adesanya, and the CAP would not be considered a final action if she chose to resign, which is the same process provided to all similarly situated residents who have been issued a CAP that is not a final action.

51. Resigning from a residency program before transferring to another is not an uncommon practice.

52. When transferring to another residency program, it is standard practice for the resident to formally resign from their current program so that the program is aware of their intentions to leave and the other program is aware of their intent start with them.

53. CCHS presented Dr. Adesanya, through her counsel, with the option to resign to avoid the CAP being considered a final action, as resignation would have allowed Dr. Adesanya to proceed with transferring to another program without incurring a reportable probation.

54. At no point did CCHS mandate that Dr. Adesanya resign, or attempt to force her to resign.

55. To the contrary, at the time Dr. Adesanya's legal counsel contacted CCHS about Dr. Adesanya continuing her graduate medical education elsewhere, CCHS was willing to have Dr. Adesanya continue the Program once she returned from leave, provided she complied with the terms of her probation.

56. On or about April 10, 2026, Dr. Adesanya informed CCHS that she had receieved an offer to transfer to the residency program at Northwestern Healthcare–Tucson.

57. Dr. Adesanya and her counsel reached out to the Program requesting that her fall CCC evaluation be sent to Northwestern Healthcare–Tucson, but requested that the evaluation be neutral, which would require the Program to substantially alter a preexisting document.

58. CCHS advised Dr. Adesanya, through her counsel, that it would be happy to send the fall CCC evaluation to Northwestern Healthcare–Tucson, but noted that it could not alter the existing documentation.

59.     However, CCHS advised Dr. Adesanya, through her counsel that requests for information about Dr. Adesanya would be answered in a neutral manner, per institutional policy, indicating dates of employment and blocks she had successfully completed.

60.     CCHS attempted to provide the requested information to Northwestern Healthcare–Tucson, but the email addresses provided by Dr. Adesanya were incorrect, preventing the information from going through.

61.     On April 13, 2026, after multiple requests for valid e-mail addresses Ms. King was finally able to receive valid email addresses, and the fall CCC reports were sent to Northwestern Healthcare–Tucson as requested.

62.     On April 15, 2026, CCHS received a release letter request from Anastasia Sokhan, MD regarding Dr. Adesanya; Ms. King escalated the request to GME and sought specification from Northwestern Healthcare–Tucson. Northwestern Healthcare clarified they were requesting verification of no PGY-2 contract, ITE scores, milestones, and completed rotation history.

63.     On April 16, 2026, Ms. King forwarded Northwestern Healthcare–Tucson a PGY-2 summary with all requested information; ITE scores, milestones, and completed rotation history.

64.     On April 20, 2026, CCHS learned from Dr. Sokhan  that Dr. Adesanya had already accepted their offer to join their family medicine residency to commence on July 1, 2026.  CCHS informed Dr. Adesanya that Northwestern Healthcare–Tucson had requested a release letter from the program and informed her that the program required her to confirm her plans before it could proceed.  Dr. Adesanya did not respond.

65. On April 23, 2026, CCHS followed up with Dr. Adesanya, through her counsel, noting that it was aware that she accepted an offer to transfer to Northwestern Healthcare–Tucson.

66. CCHS further provided that, in order to provide Northwestern Healthcare–Tucson with a release letter, which is required to authorize the transfer of a resident's training records and evaluations to another program, CCHS would need to know her intentions because she had not yet confirmed to CCHS that she intended to transfer from the Program.

67. CCHS never received any confirmation from Dr. Adesanya regarding her transfer to Northwestern Healthcare–Tucson, and as a result, CCHS was unable provide a release letter to Northwestern Healthcare–Tucson.

68. CCHS made continuous attempts to work with Dr. Adesanya to help her succeed upon her return to the Program or to assist with her transfer to another graduate medical program if that was her desire; however, Dr. Adesanya did not cooperate with those efforts and CCHS was left to wonder whether Dr. Adesanya intended to return from her leave and rejoin the Program.

69. On April 30, 2026, CCHS again attempted to follow up with Dr. Adesanya regarding her intention to return to the program. When no response was forthcoming, on May 4, 2026, the Designated Institutional Official ("DIO") reviewed Dr. Adesanya's grievance and determined based on substantial evidence to uphold the probation. On May 5, 2026, Dr. Adesanya was informed that her probation was now considered final.

70. Thereafter, on May 8, 2026, CCHS was notified by the ACGME of a complaint filed by Dr. Adesanya on or about May 5, 2026, alleging the Program was in violation of ACGME requirements, and further alleging that she was sexually assaulted by a male attending while in the Program.

71. Upon information and belief, the male attending referred to in Dr. Adesanya's ACGME complaint was Dr. Fleishman.

72. The Program responded to Dr. Adesanya's complaint on May 14, 2026.

73. On May 26, 2026, the ACGME Review Committee for Psychiatry closed Dr. Adesanya's complaint without taking any further action.

74. On May 29, 2026, Dr. Adesanya filed her Complaint in the District Court for the Eastern District of North Carolina against CCHS and Dr. Fleishman, alleging claims under federal and state law related to her employment with CCHS.

75. On June 30, 2026, the term of Dr. Adesanya's Agreement ended and Dr. Adesanya had not completed all requirements under the Agreement to be promoted to PGY-3.

76. Upon information and belief, after filing her lawsuit, Dr. Adesanya assisted her supporters in creating and maintaining a public GoFundMe fundraiser entitled "DO NO HARM: When speaking up costs you everything" (the "fundraiser"), which was created on July 10, 2026.

77. Upon information and belief, the fundraiser was created by personal friends of Dr. Adesanya, as evidenced by the fact that the fundraiser states "[t]his GoFundMe is

for our brilliant friend, Busayo, professionally known as Dr. Olubusayo Adesanya" with the information contained within the fundraiser being provided by Dr. Adesanya.

78. Upon information and belief, the fundraiser included numerous allegations from Dr. Adesanya's Complaint concerning CCHS and Dr. Fleishman, but also added other materially false representations not mentioned within her Complaint, including, but not limited to, allegations that CCHS tried to compel her to resign and that she had been fired for reporting sexual harassment and discrimination.

79. The fundraiser further encouraged public support for Dr. Adesanya and sought monetary contributions based upon the narrative presented therein.

80. Upon information and belief, Dr. Adesanya did not limit dissemination of these false and malicious allegations to the lawsuit, her attorneys, or judicial proceedings.

81. Instead, Dr. Adesanya intentionally disseminated the fundraiser to current and former residents, physicians, and other members of the medical community through direct communications and by publicly sharing the link to the fundraiser across social media.

82. Around the same time that the fundraiser began, Dr. Adesanya began posting on social media about the fundraiser.

83. Upon information and belief, Dr. Adesanya's own social media posts not only included references to the original fundraising post that contained allegations outside of her lawsuit, but she made reference to other actions that she was taking and made claims outside the scope of the lawsuit.

84. Upon information and belief, Dr. Adesanya has also communicated with social-media personalities and "medical influencers" having substantial online audiences and provided materially false and defamatory information concerning CCHS and Dr. Fleishman, and has done so with the intent of causing injury to CCHS and Dr. Fleishman.

85. Specifically, one such influencer has posted a TikTok and Instagram "reel" publishing a cease and desist letter sent directly to Dr. Adesanya, and only Dr. Adesanya.

86. Upon information and belief, those social-media personalities and "medical influencers" accepted her allegations as true and published the same to their followers, as evidenced by recent posts made by social media influencers on Instagram and TikTok, including but not limited to a July 15, 2026 Instagram post under the account "thehoodpsychdoc," a July 16, 2026 TikTok post by user "the_surgeon_coach," and a July 18, 2026 Instagram post under the account "arghavansallesmd."

87. At least one of the individuals who has posted these videos identified Dr. Adesanya as a personal friend.

88. Upon information and belief, Dr. Adesanya has continued to coordinate with these influencers and has provided ongoing information to them.

89. Upon discovery of these publications from Dr. Adesanya, counsel for Counterclaim-Plaintiff's sent correspondence to Dr. Adesanya to cease reproducing and/or assisting in the reproduction of defamatory allegations to third-parties outside of the judicial process.

90. However, Dr. Adesanya supplied that correspondence to additional influencers, which itself ended up being published.

91. Dr. Adesanya has also published recordings on social media that have been edited and presented out of context in an effort to intentionally harm Counterclaim-Plaintiffs.

92. As a direct result of Dr. Adesanya's communications, numerous third parties republished these damaging, malicious, and entirely fabricated accusations against Counterclaim-Plaintiffs across social media platforms and other public forums.

93. These republications reached audiences far beyond the participants in the underlying litigation, and included hundreds of thousands of members of the public, current and prospective patients, physicians, residents, recruiters, accrediting stakeholders, and members of the medical community.

94. These republications are ongoing in nature, and Dr. Adesanya continues to refuse to correct or rescind the republications. As of July 31, 2026, Dr. Adesanya's personal Facebook Page is still encouraging social media influencers to continue posting about this matter regardless of false and defamatory content that exceeds the bounds of first amendment protections.

95. The false, extra-judicial publications conveyed as factual assertions that Dr. Fleishman engaged in sexual misconduct, assaultive conduct, and other improper behavior directed toward Dr. Adesanya.

96. The publications further conveyed as factual assertions that CCHS knowingly ignored, concealed, ratified, or covered up such misconduct and retaliated against Dr. Adesanya for reporting it.

97.     The publications further conveyed as factual assertions that CCHS fabricated concerns regarding Dr. Adesanya's performance and professionalism to justify adverse actions against her.

98.     At the time the statements were published, Dr. Adesanya knew these statements concerning Counterclaim-Plaintiffs were false.

99.     Nevertheless, Dr. Adesanya intentionally published and caused to be republished the statements to third parties, and did so outside any judicial proceeding.

100.    As a direct and foreseeable result of these publications, Counterclaim-Plaintiffs have suffered reputational injury, public criticism, disruption of professional relationships, and other damages to be proven at trial.

101.    The publications continue to be accessible online and continue to be republished by third parties.

## COUNT I - DEFAMATION

102.    Counterclaim-Plaintiffs repeat and reallege the preceding paragraphs of their Counterclaims as if fully set forth herein.

103.    Upon information and belief, Dr. Adesanya published and republished statements to third parties outside the context of judicial proceedings, including through crowdfunding platforms, social media, direct communications, and communications with online influencers.

104.    Such statements were made with actual malice.

105.    Specifically, such statements were made with knowing falsity, or alternatively with a reckless disregard for the truth.

106. The statements were intentionally and maliciously communicated to numerous third parties.

107. The aforementioned statements constitute defamation and libel by impugning Counterclaim-Plaintiffs in their profession, trade, and business and accusing them of conduct incompatible with the proper exercise of their profession.

108. Alternatively, the aforementioned statements made by Dr. Adesanya constitute defamation and libel per quod, and Counterclaim-Plaintiffs have and will incur special damages, including damages arising from permanent loss of business relationships, contracts, and lost business opportunities.

109. Dr. Adesanya further intended and reasonably expected that the statements would be republished by third parties, including individuals with substantial social-media followings.

110. The widespread republication of the statements was the natural and foreseeable consequence of Dr. Adesanya's conduct.

111. This defamation and libel are ongoing in nature, and Counterclaim-Plaintiffs continue to experience reputational and financial harm as a result.

112. As a direct and proximate result, Counterclaim-Plaintiffs have sustained damages and are entitled to recover all legal and equitable remedies available for Dr. Adesanya's defamation and libel in an amount to be determined by a jury, which in any event exceeds $25,000.00.

WHEREFORE, Defendants/Counterclaim-Plaintiffs pray that the Court:

1.      Enter judgment in favor of Defendants/Counterclaim-Plaintiffs and award Plaintiff nothing;

2.      Tax the costs of this action and such attorneys' fees as allowed by law against Plaintiff;

3.      That judgment be entered in favor of Defendants/Counterclaim-Plaintiffs regarding all counterclaims alleged herein;

4.      For a trial by jury on all issues so triable; and

5.      Award Defendants/Counterclaim-Plaintiffs such other and further relief as the Court deems just and proper.

This the 31st day of July, 2026.

/s/  Jeremy D. Locklear
Jeremy D. Locklear (NC State Bar No. 50842)
PARKER POE ADAMS & BERNSTEIN LLP
301 Fayetteville Street, Suite 1400
P.O. Box 389 (27602-0389)
Raleigh, North Carolina  27601
Telephone:  (919) 890-4161
Facsimile:  (919) 834-4564
Email:  jeremylocklear@parkerpoe.com

*Counsel for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a copy of the foregoing **ANSWER AND COUNTERCLAIMS** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notice and serve the same upon counsel of record via the Court's electronic case filing system.

This the 31st day of July, 2026.

/s/  Jeremy D. Locklear
Jeremy D. Locklear (NC State Bar No. 50842)
PARKER POE ADAMS & BERNSTEIN LLP
301 Fayetteville Street, Suite 1400
P.O. Box 389 (27602-0389)
Raleigh, North Carolina  27601
Telephone:  (919) 890-4161
Facsimile:  (919) 834-4564
Email:  jeremylocklear@parkerpoe.com

*Counsel for Defendants*