**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

Civil Action No. 5:26-cv-368-FL

| | | |
|---|---|---|
| OLUBUSAYO ADESANYA, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **AMENDED COMPLAINT** |
| CUMBERLAND COUNTY HOSPITAL SYSTEM, INC. d/b/a Cape Fear Valley Health Systems, Cape Fear Valley Health, Cape Fear Valley Behavioral Health Care, and/or Cape Fear Valley Medical Center and KENNETH FLEISHMAN, M.D., | ) | **(JURY TRIAL DEMANDED)** |
| | ) | |
| Defendants. | ) | |

COMES NOW Plaintiff Olubusayo Adesanya, M.D. ("Dr. Adesanya"), by and through undersigned counsel, and brings this action against Defendant Cumberland County Hospital System, Inc. d/b/a Cape Fear Valley Health Systems, Cape Fear Valley Health, Cape Fear Valley Behavioral Health Care, and/or Cape Fear Valley Medical Center ("Defendant CCHS") and Kenneth Fleishman, M.D. ("Defendant Fleishman") (collectively, "Defendants"), alleging as follows:

## INTRODUCTION

1. Dr. Adesanya is a black female physician who began employment with Defendant CCHS in June 2025 as a second-year psychiatry resident at Cape Fear Valley Medical Center ("CFV Medical Center").

2. After Dr. Adesanya made internal reports of sexual harassment by Defendant Fleishman and of patient safety violations, Defendant CCHS retaliated against Dr. Adesanya by placing her on probation for alleged deficiencies a mere thirty-two days after Defendant CCHS had given Dr. Adesanya an almost perfect residency evaluation.

3. CCHS then engaged in a sustained campaign of retaliation that included the dissemination to her peers and colleagues of private medical details, her placement on an unjustified probationary status, and the eventual nonrenewal of her employment contract.

4. Defendant Fleishman is liable in his own right based on his sexually assaultive conduct on multiple occasions, conduct that CCHS failed to prevent and ratified by its conduct.

5. Dr. Adesanya alleges that Defendant violated her rights under federal employment statutes and asserts supplemental claims for violations of the laws of North Carolina. She seeks the economic, compensatory, and punitive damages available to her under federal and state law, as well as an award of attorneys' fees.

## PARTIES

6. **Plaintiff Olubusayo Adesanya, M.D. ("Dr. Adesanya")** is a citizen and resident of Pima County, Arizona who was employed at Cape Fear Valley Medical Center.

7. **Defendant Cumberland County Hospital Systems, Inc. ("Defendant CCHS")** is a North Carolina corporation with its principal place of business in Fayetteville, Cumberland County, North Carolina. It has been served with the original complaint through its registered agent for service, Michael Nagowski, at 1638 Owen Drive, Fayetteville, North Carolina, 28304.

8. At all times relevant herein, Defendant CCHS operated under a variety of business names including Cape Fear Valley Health Systems, Cape Fear Valley Health, Cape Fear Valley Behavioral Health Care, and/or Cape Fear Valley Medical Center.

9. Defendant CCHS owns and operated Cape Fear Valley Medical Center, located at 1638 Owen Drive, Fayetteville, North Carolina, 28304.

10. **Defendant Kenneth Fleishman, M.D. ("Defendant Fleishman")** is, upon information and belief, a citizen and resident of Cumberland County. North Carolina.

11. At all times relevant herein, Defendant Fleishman was a supervising attending physician in the Child and Adolescent Psychiatry department at Cape Fear Valley Medical Center and the department chair for Defendant CCHS's psychiatry residency program.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is an action based on violations of Title VII.

13. This Court has supplemental jurisdiction over Dr. Adesanya's state common law claims pursuant to 28 U.S.C. § 1367.

14. Defendants are each subject to the personal jurisdiction of this Court because they each reside in or have their principal place of business in this judicial district. Further, Defendants are both present in and regularly transact business in this judicial district and engaged in the conduct that is the subject of this lawsuit within this judicial district.

15. Venue is proper in this Court as the events giving rise to this action occurred in Cumberland County, and both Defendants, upon information and belief, reside or have offices in Cumberland County, which is within this judicial district.

16. Dr. Adesanya timely filed a Charge of sex discrimination and retaliation with the EEOC on February 13, 2026 (Charge No. 433-2026-01608).

17. On February 28, 2026, Dr. Adesanya received her Notice of Right to Sue.

18. Since the filing of her initial lawsuit, Dr. Adesanya filed on August 3, 2026, a second EEOC charge invoking claims of race and disability discrimination and on September 11, 2026, obtained a subsequent Right to Sue (Charge No. 433-2026-04334).

19. This lawsuit is being filed within all applicable statutes of limitations and repose, and Dr. Adesanya has exhausted her administrative remedies as required under applicable law.

## FACTUAL ALLEGATIONS

### Employment background

20. Dr. Adesanya graduated from Meharry Medical College in Nashville, Tennessee, with her Master of Health Science in 2018 and her Doctor of Medicine in 2023.

21. After successfully completing her first year of residency in Family Medicine at Atrium Health Floyd Medical Center in Rome, Georgia, Dr. Adesanya transferred to a psychiatry residency program at CFV Medical Center in Fayetteville, Cumberland County, North Carolina, and changed her practice specialty to psychiatry.

22. Defendant CCHS owns and operates CFV Medical Center, which is an acute care teaching hospital facility, and other health care facilities in and around Cumberland County, North Carolina.

23. CCHS credited Dr. Adesanya's prior residency experience, which means that she entered CCHS's psychiatry program as a second-year resident rather than restarting as a first-year resident. Accreditation of a first year at another institution is not the norm for transferring residents, and it happened because of Dr. Adesanya's exceptional academic and clinical performance.

24. In June 2025, Dr. Adesanya received her Resident Training License from the North Carolina Medical Board and that same month began employment at CCHS.

25. Dr. Adesanya was employed pursuant to a one-year Postgraduate Training Agreement between CCHS and Dr. Adesanya, subject to renewal.

26. The Postgraduate Training Agreement provided for annual compensation of approximately $62,951.00 with benefits.

27. Dr. Adesanya reasonably anticipated continued employment with Defendant through completion of her psychiatry residency and eventual advancement into an attending psychiatrist position.

**Dr. Adesanya's ED Psych Rotations**

28. Dr. Adesanya's first rotation at CFV Medical Center was in Emergency Department Psychiatry ("ED Psych") from approximately June 30, 2025, to July 27, 2025.

29. In her first-ever psychiatry rotation, she received overwhelmingly positive evaluations from supervising physicians and faculty members with multiple evaluators

assessing Dr. Adesanya's performance as the equivalent of a Level 2 and Level 3 psychiatry resident under the Accreditation Council for Graduate Medical Education ("ACGME") Psychiatry Milestones framework.[1]

30. Dr. Adesanya's second ED Psych rotation lasted approximately October 10, 2025, to November 16, 2025.

31. For both ED Psych rotations, multiple evaluators offered exceptional praise for Dr. Adesanya's performance.

32. After Dr. Adesanya's first ED Psych rotation, Dr. Klenzak — the program director for the psychiatry residency program at CFV Medical Center — noted that "Dr. Adesanya did a GREAT job on her first rotation at CFV. She is bringing a lot of skills and I saw clear progress each week during the rotation. She has a great bedside manner and is calm and clear with patients and staff. We are SO glad she is here in the program[.]"

33. After Dr. Adesanya's second ED Psych rotation, Dr. Klenzak commented that "Dr. Adesanya has made clear progress since her last time in the [Emergency Department]. She truly takes ownership of her patients and strives every day to do her best. She feels more comfortable and relaxed with the team and appears to understand and appreciate the importance of collaboration."

[1] The ACGME Psychiatry Milestones framework is a competency-based system used to assess the development of psychiatry residents during training in ACGME-accredited residency programs. *See* Accreditation Council for Graduate Medical Education, *Psychiatry Milestones* (2020), https://www.acgme.org/globalassets/pdfs/milestones/psychiatrymilestones.pdf (last visited 28 May 2026).

34. Dr. Victoria Teague had a similar evaluation of Dr. Adesanya, highlighting that "Dr. Adesanya shows empathy and compassion for her patients; she is often able to build rapport with challenging patients."

35. Likewise, Dr. Audrey Petteruti noted that "Dr. Adesanya has a compassionate approach to patient care!"

36. Dr. Breonna Kinnison noted that Dr. Adesanya "genuinely cares about every patient and does everything in her power to establish a strong therapeutic rapport. She has strong medical knowledge, truly wants to soak up every learning opportunity, and is a strong advocate for her patients. . . . Her patients are lucky to have her in their corner, and I think she makes a great addition to this program!"

**Dr. Adesanya First Experiences Sexual Harassment**

37. On September 2, 2025, Dr. Adesanya experiences a traumatic and stunning episode of sexual harassment by Defendant Fleishman, an attending physician, during her Adolescent IP Psych rotation.

38. Fleishman forced Dr. Adesanya into the narrow confines of a supply closet and positioned himself to block her exit.

39. Defendant Fleishman then began advancing closer to Dr. Adesanya while sneering to her that she was not very smart and that some women deserve to be raped.

40. Before Defendant Fleishman could continue any further, another employee opened the door to the supply closet, allowing Dr. Adesanya to immediately flee.

41. Dr. Adesanya verbally reported this incident to her program director, Dr. Klenzak, and her program coordinator, Ms. Arielle King.

42. Ms. King asked Dr. Adesanya if Dr. Adesanya wanted Ms. King to chaperone her rotation under Defendant Fleishman, but Dr. Adesanya declined, believing that she was not scheduled to have additional rotations with him.

43. Remarkably, CCHS did not conduct any investigation of Dr. Adesanya's report of a narrowly averted sexual assault by a senior physician in a position of stature, with ongoing opportunities to subject other employees to similar misconduct.

**Dr. Adesanya's CCC Evaluation**

44. On December 12, 2025, Dr. Adesanya received her semi-annual evaluation from the Clinical Competency Committee ("CCC"), a committee of CFV Medical Center faculty members who meet to review residents' performance data.

45. Dr. Adesanya's CCC evaluation noted that Dr. Adesanya "[g]enuinely cares about every patient and does everything in her power to establish a strong therapeutic rapport," that Dr. Adesanya "is a strong advocate for her patients," and that Dr. Adesanya has a "[g]reat bedside manner and is calm and clear with patients and staff."

46. The CCC evaluation further noted that Dr. Adesanya had "strong medical knowledge" and was a "[g]reat addition to this program."

47. The CCC evaluation listed several areas for improvement — confidence in decision-making, note-taking, and incorporation of feedback — but noted that "there was no relative deficit in these areas noted, just guidance on the overall importance of these areas."

**Dr. Adesanya's Adolescent IP Psych Rotation and Episodes of Sexual and Racial Harassment**

48. From approximately December 15, 2025, to January 11, 2026, Dr. Adesanya was assigned to the Adolescent In-Patient Psychiatry ("Adolescent IP Psych") rotation under the supervision of Dr. Hudaisa Hafeez.

49. During the third week of her rotation, Defendant Fleishman filled in for Dr. Hafeez as the supervising physician.

50. CCHS, despite its awareness of Dr. Adesanya's previous complaint against Fleishman, never provided Dr. Adesanya with any notice that Fleishman would be filling in for Dr. Hafeez.

51. This was Dr. Adesanya's first time working with Fleishman since the September assault.

52. During a joint consultation involving a minor patient who had been raped by her adult brother, Fleishman rebuffed Dr. Adesanya's recommendation to alert the North Carolina Department of Social Services about the event.

53. Defendant Fleishman asked Dr. Adesanya if she knew what incest was, and if she thought incest was morally wrong.

54. When Dr. Adesanya replied affirmatively to both odd questions, Fleishman stunned her by telling her that it was "elitist" of her to think that an adult siblings' rape of a minor was "neglect" or "sexual abuse" or even "wrong."

55. The conversation deteriorated into Fleishman telling Dr. Adesanya he hoped that she would be raped one day and that it would be "very fortunate" for him if Dr. Adesanya were sued by the minor patient's mother.

56. During another encounter with Fleishman during this same rotation, on or about January 2, 2026, he screamed at Adesanya in front of another resident and repeatedly ordered her to "come here".

57. Dr. Adesanya reported these incidents of Fleishman's aggression and his second reference to rape to her program director, Dr. Klenzak, and her program coordinator, Ms. King.

58. Instead of taking tangible actions, Dr. Klenzak did no better than a banality about "how hard this must be for [Dr. Adesanya]," and Ms. King recommended that Dr. Adesanya take the day off without exhausting PTO or a sick day.

**Dr. Adesanya's Report of Patient Safety Concerns**

59. On December 21, 2025, during the Adolescent IP Psych rotation, Dr. Adesanya observed serious patient safety concerns, including the prescribing of contraindicated medications to vulnerable psychiatric patients, discouraging disclosure of medication side effects to both patients and their parents, and failing to appropriately respond to allegations of child abuse, sexual abuse, suicidality, and psychosis.

60. Dr. Adesanya verbally reported these concerns to Ms. King, on December 22, 2025, and to Dr. Klenzak, on December 31, 2025.

61. On January 5, 2026, Dr. Adesanya sent Dr. Klenzak an email with the following details:

> a. On December 16, 2025, Dr. Hafeez initially forbade Dr. Adesanya from filing a CPS report on a minor patient who had reported physical abuse and then, the next day, "picked up" the minor patient from Dr. Adesanya and prohibited Dr. Adesanya from seeing the minor patient or speaking with the minor patient's parent.

b. On December 19, 2025, Dr. Hafeez forbade Dr. Adesanya from inquiring about a patient's eating disorder history, despite the relevance of that information for determining the clinical appropriateness of whether Dr. Adesanya should prescribe the patient with a stimulant medication.

c. On December 22, 2025, Dr. Adesanya asked Dr. Hafeez if they could obtain a baseline EKG for a patient she and another physician had placed on an antipsychotic because antipsychotic medications can carry known cardiovascular risks, but Dr. Hafeez declined and responded that Dr. Adesanya cannot "just get labs for just anything."

d. That same day, Dr. Adesanya saw a teenage patient presenting with suicidal ideation, and Dr. Adesanya suggested screening the patient for substance use. Dr. Hafeez scoffed at Dr. Adesanya's suggestion and told Dr. Adesanya to take Dr. Hafeez's feedback and "keep quiet and just agree" so Dr. Adesanya would not get into trouble. Dr. Hafeez told Dr. Adesanya to stop asking her questions because Dr. Hafeez was "just here to do [her] job and that's it."

e. During Dr. Adesanya's second week of the rotation, Dr. Hafeez refused to call a parent of a minor patient because she did not feel like providing a letter that the parent needed for social work purposes.

f. Despite Dr. Adesanya's pleas for guidance during Dr. Adesanya's first and second weeks of the rotation, Dr. Hafeez refused to prepare Dr. Adesanya for Dr. Adesanya's first court appearance in which she had been called to advocate for one of her patients.

g. Defendant Fleishman, while stepping in for Dr. Hafeez, actively worked against Dr. Adesanya to advocate for a minor patient who was being raped by her older brother and who was being sold by her mother for cocaine.

62. Prior to Dr. Adesanya's employment, CFV Medical Center had been placed on "immediate jeopardy" status — the most severe patient safety finding available under federal healthcare regulations — on multiple occasions due to serious patient safety failures involving psychiatric patients and failures to report child abuse.

63. That same day, on January 5, Dr. Adesanya met with Dr. Klenzak and described in detail the impact Fleishman's behavior was having on her. During that

conversation, she related that she was receiving psychiatric care for the stress she was experiencing and that Fleishman's toxic conduct had exacerbated her underlying depression and anxiety.

64. Dr. Adesanya also supplemented her observation in the meeting with a written statement describing Fleishman's sexually inappropriate language and references to sexual violence on multiple occasions. She also included in the statement an additional claim that Fleishman had made racially derisive comments about minority patients in her presence.

**Retaliation Against Dr. Adesanya**

65. On January 5, 2026 — the same day that Dr. Adesanya emailed Dr. Klenzak with the patient safety concerns she had witnessed — Dr. Adesanya was pulled from her Adolescent IP Psych rotation.

66. Eight days later, on January 13, 2026, the CCC Committee voted to place Dr. Adesanya on probation, claiming that a slew of new deficiencies had suddenly presented themselves between December 12, 2025 — the date of Dr. Adesanya's last and positive CCC evaluation — and January 13, 2026.

67. On January 22, Dr. Klenzak and a representative of the human resource ("HR") department confronted Dr. Adesanya with a claim that colleagues had leveled a complaint of bullying and unprofessional behavior. During the meeting, Dr. Adesanya expressed her perspective that she was targeted for racial reasons.

68. On February 3, 2026, Dr. Adesanya — *and the entire psychiatry department* — were presented a copy of an official notice that the CCC had placed Dr. Adesanya on a "Corrective Action Plan/Probation (CAP)", effective immediately.

69. Specifically, the notice alleged deficiencies ranging from a purported inability to communicate effectively, difficulty collaborating with other members of a patient's treatment team, a limited knowledge of psychopharmacology and diagnosis, a "contemptuous attitude," and lapses in professionalism.

70. In the approximate month between her positive review and her placement on probation, Dr. Adesanya did not receive any contemporaneous feedback that her performance was plummeting or that her behavior fell short of professional standards. The attack on her skills and demeanor surfaced only after she lodged complaints of inappropriate workplace conduct and breaches in the quality of care.

71. The department wide notice also referred to details of Dr. Adesanya's confidential medical and mental health history that she disclosed on January 5 and accused Dr. Adesanya of "splitting," a term associated with borderline personality disorder, despite Dr. Adesanya having no such diagnosis.

72. After receiving the notice, Dr. Adesanya immediately met with Dr. Klenzak to protest her probation decision. During this meeting, Dr. Klenzak admitted that "everything is subjective" and stated that he did not know why Dr. Adesanya had been placed on probation.[2]

[2] Dr. Adesanya found this response odd because the residency handbook provides that probation decisions are made by the program director, which, in this case, is Dr. Klenzak.

73. When Dr. Adesanya inquired whether her probationary status had anything to do with her report about Fleishman's sexual assault, Dr. Klenzak laughed dismissively and told Dr. Adesanya to stop "demonizing" and "vilifying" Fleishman.

74. Dr. Klenzak made another comment that jarred Dr. Adesanya. He asked her if she was experiencing suicidal tendencies and shared that there were fears about her stability on the part of departmental leadership.

75. On February 17, Dr. Adesanya filed with the human resources department to the effect that her probation and the peer complaints against her reflected retaliation for her prior internal complaints.

76. On February 19, Dr. Adesanya also submitted a charge of sex discrimination and retaliation to the EEOC and nine days later, on February 28, 2026, she obtained a Right to Sue letter. EEOC regulations require that the subject of the complaint are informed of a charge within days of receipt and that they are immediately alerted to the issuance of a Right to Sue notice.

77. On February 19, Dr. Adesanya experienced a panic attack at work that multiple colleagues witnessed. She attributes the attack to a triggering memory of the sexually assaultive behavior she experienced from Fleishman in September 2025.

78. Dr. Adesanya was advised on March 17, 2026 that CCHS would provide her a neutral reference if she opted to transfer from the program—a communication that she viewed as an effort to coerce her to abandon her residency at Cape Fear Valley.

79. In the same mid-March time frame, based on a medical diagnosis that she was suffering from post-traumatic stress disorder (PTSD"), Dr. Adesanya began a medical

leave set to last through May 2026. Because she was not yet eligible for coverage under the Family and Medical Leave Act, she requested the leave as an accommodation under the ADA.

80. In April 2026, Dr. Adesanya's apprehension about her treatment led her to explore the option of transfer. The sole viable pathways she discovered were family medicine programs outside her specialty-not her preferred path—and she discovered that Cape Fear Valley was placing obstacles in her path.

81. Twice, in the April to May time frame, Cape Fear Valley declined to provide letters of verification that Dr. Adesanya was a resident in good standing to two clinics-one in Arizona, the other in California-who were prepared to accept her application. When she pressed for clarification on the delay, she was told that the letters would be provided only if she offered her letter of resignation in advance.

82. On May 1, 2026, Dr. Adesanya informed her department that she would not resign from the residency program.

83. On May 5, Dr. Adesanya was notified that her probationary status would not be removed. She did not, and never would, receive a resolution of the HR complaints against her.

84. On May 13, Dr. Adesanya notified the clinic that she had not been medically cleared to report to work by her projected report date of May 20, 2026, and that her return might need to be delayed. She applied for an extension through CCHS' third-party provider.

85. On May 29, Dr. Adesanya filed her original lawsuit.

86. On June 2, the North Carolina Medical Board received false allegations of "impairment" related to Dr. Adesanya which she successfully challenged on June 3.

87. On June 17, Dr Adesanya's original attorneys were offered a proposal in which Dr. Adesanya's contract would be renewed only if she consented to dismiss her lawsuit and repeat her second year of residency: an unacceptable offer to her that openly conditioned her employment on an agreement to abandon the exercise of her legal rights.

88. On June 30, 2026, while she remained on leave pending clearance from her physician, Dr. Adesanya was notified that her contract would not be renewed.

89. In terminating her contract, CCHS failed to adhere to the terms of the employment agreement, which mandated written notice in advance of non-renewal and provided an opportunity to challenge the decision in writing.

## COUNT I
**Discrimination Based on Sex**
**Title VII, 42 U.S.C. § 2000e-2(a)**
**(Against Defendant CCHS)**

90. The factual allegations contained herein are realleged and incorporated by reference as if fully set forth herein.

91. Dr. Adesanya was an employee of Defendant CCHS, and Defendant CCHS was her employer, as those terms are defined in 42 U.S.C. § 2000e.

92. Defendant Fleishman is an employee of Defendant CCHS and, during certain rotations, Dr. Adesanya's direct supervising physician.

93. Dr. Adesanya was repeatedly sexually harassed by Defendant Fleishman on the basis of her sex.

94. The conditions to which Dr. Adesanya was subjected, i.e., a closed quarter, closed door encounter in which she was directly threatened with an act of sexual violence and a second incident where Fleishman made egregiously offensive comments about incest and brought up the specter of Dr. Adesanya being raped again, were severe enough that they altered the terms of her working conditions.

95. Defendant CCHS knew or should have known of Defendant Fleishman's harassment of Dr. Adesanya since Dr. Adesanya reported Defendant Fleishman's actions to Defendant CCHS's program director and program coordinator. Rather than remedy the harassment, CCHS took no tangible corrective steps and subjected Dr. Adesanya to unwarranted corrective action in the aftermath of her written complaints of her harassment.

96. As a direct and proximate result of the harassment based on her sex that was created by Defendant Fleishman and ratified by Defendant CCHS, Dr. Adesanya has suffered and will continue to suffer harm including, but not limited to, lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional distress, mental anguish, and other economic and non-economic damages.

97. Dr. Adesanya is entitled to and seeks all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief.

98. Dr. Adesanya also seeks and should be awarded her reasonable costs and attorneys' fees under 42 U.S.C. § 2000e-5(k), which she has been required to incur to prosecute this action.

## COUNT II
**Retaliation**
**Title VII, 42 U.S.C. § 2000e, *et seq.***
**(Against Defendant CCHS)**

99. The factual allegations contained herein are realleged and incorporated by reference as if fully set forth herein.

100. Dr. Adesanya engaged in a protected activity when she reported Defendant Fleishman's harassment on the basis of her sex.

101. In retaliation for Dr. Adesanya's participation in these protected activities, Defendant CCHS placed Dr. Adesanya on probationary status and eventually chose not to renew her contract of employment.

102. The retaliation endured by Dr. Adesanya would dissuade any reasonable employee from making complaints of discrimination and harassment or participating in an investigation of discrimination and harassment.

103. The retaliatory conduct by Defendant CCHS against Dr. Adesanya constitutes a violation of Title VII, 42 U.S.C. § 2000e-3(a).

104. There may be more detrimental acts of which Dr. Adesanya is unaware which may also constitute retaliation in that it harmed her.

105. As a direct and proximate result of the retaliatory conduct of her employer, Defendant CCHS, Dr. Adesanya has suffered and will continue to suffer harm including, but not limited to, lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional distress, mental anguish, and other economic and non-economic damages.

106. Dr. Adesanya seeks and is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief.

107. Dr. Adesanya also seeks and should be awarded her reasonable costs and attorneys' fees under 42 U.S.C. § 2000e-5(k), which she has been required to incur to prosecute this action.

**COUNT III**
**Retaliation**
**42 U.S.C. § 1981**
**(Against Defendant CCHS)**

108. The factual allegations contained herein are realleged and incorporated by reference as if fully set forth herein.

109. Dr. Adesanya engaged in a protected activity when in January 2026 she reported Defendant Fleishman's racially charged comments regarding patients who contracted with CCHS for the provision of medical services and when she alleged that she was being targeted for racially discriminatory reasons.

110. In retaliation for Dr. Adesanya's participation in these protected activities, Defendant CCHS placed Dr. Adesanya on probationary status and eventually chose not to renew her contract of employment.

111. There may be more detrimental acts of which Dr. Adesanya is unaware which may also constitute retaliation in that it harmed her.

112. The retaliation endured by Dr. Adesanya would dissuade any reasonable employee from making complaints of discrimination and harassment or participating in an investigation of discrimination and harassment.

113. The retaliatory conduct by Defendant CCHS against Dr. Adesanya constitutes a violation of 42 U.S.C. § 1981.

114. As a direct and proximate result of the retaliatory conduct of her employer, Defendant CCHS, Dr. Adesanya has suffered and will continue to suffer harm including, but not limited to, lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional distress, mental anguish, and other economic and non-economic damages.

115. Dr. Adesanya seeks and is entitled to all legal and equitable remedies available for violations of § 1981 including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief.

116. Dr. Adesanya also seeks and should be awarded her reasonable costs and attorneys' fees under 42 U.S.C. § 2000e-5(k), which she has been required to incur to prosecute this action.

**COUNT IV**
**Disability discrimination**
**The Americans with Disabilities Act, 42 U.S.C.A § 12112**
**(Against Defendant CCHS)**

117. The factual allegations contained herein are realleged and incorporated by reference as if fully set forth herein.

118. Dr. Adesanya at all relevant times to this complaint had a disability as defined by the ADA in that she suffered from clinically diagnosed depression and anxiety as well as PTSD.

119. Dr. Adesanya was able to able to perform the essential functions of her job with the reasonable accommodations of a medical leave of limited duration.

120. Defendant CCHS subjected Dr. Adesanya to adverse actions based on her disability including but not limited to publicizing her condition to individuals within the organization, her placement on a probationary status, and the eventual nonrenewal of her contract.

121. The retaliatory conduct by Defendant CCHS against Dr. Adesanya constitutes a violation of the ADA, 42 U.S.C. § 12112(a).

122. There may be more detrimental acts of which Dr. Adesanya is unaware which may also constitute retaliation in that it harmed her.

123. As a direct and proximate result of the discriminatory conduct of her employer, Defendant CCHS, Dr. Adesanya has suffered and will continue to suffer harm including, but not limited to, lost earnings, lost benefits, lost future employment opportunities, humiliation, embarrassment, reputational harm, emotional distress, mental anguish, and other economic and non-economic damages.

124. Dr. Adesanya seeks and is entitled to all legal and equitable remedies available for violations of ADA, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief.

125. Dr. Adesanya also seeks and should be awarded her reasonable costs and attorneys' fees under 42 U.S.C. § 2000e-5(k), which she has been required to incur to prosecute this action.

**<u>Count V</u>**
**Negligent Hiring, Supervision, and/or Retention**
**(Against Defendant CCHS)**

126. The factual allegations contained herein are realleged and incorporated by reference as if fully set forth herein.

127. Defendant CCHS owed a legal duty of reasonable care to Dr. Adesanya to provide Dr. Adesanya with a safe place to work, free from sexually assaultive behavior of its employees.

128. Defendant CCHS also owed a duty to Dr. Adesanya not to hire or retain an employee — such as Defendant Fleishman — that it knew or reasonably should have known had a propensity to use his authority as Dr. Adesanya's supervising physician to intimidate her and sexually harass her.

129. Defendant CCHS is liable for the tortious acts of an employee that it knew or should have known was unfit for employment yet chose to retain him.

130. Defendant CCHS breached this duty when it did not exercise reasonable care in the hiring, supervision, and/or retention of its employee, Defendant Fleishman.

131. Dr. Adesanya would not have been sexually harassed but for the negligence of Defendant CCHS is hiring and retaining Defendant Fleishman and/or failing to properly supervise Defendant Fleishman.

132. As a result, any tortious acts that were committed by Defendant Fleishman against Dr. Adesanya in the workplace — and the resultant injuries to Dr. Adesanya — were the proximate and foreseeable result of such negligent hiring, supervision, and retention of Defendant Fleishman.

133. As a direct and proximate result of Defendant CCHS's breach of its duties, Defendant Fleishman sexually harassed Dr. Adesanya, causing her severe emotional distress, including, but not limited to, anxiety, fear, humiliation, embarrassment, depression, low self-esteem, and loss of enjoyment in life.

134. Dr. Adesanya seeks and is entitled to actual and compensatory damages for the severe mental and emotional distress that she experienced during and because of her employment in an amount to be determined by a jury but, in any event, in excess of $25,000.00.

## COUNT VI
## Negligence – Ratification
## (Against Defendant CCHS)

135. The factual allegations contained herein are realleged and incorporated by reference as if fully set forth herein

136. An employer who ratifies the tortious conduct of its employees, even by omission to act, is liable for such conduct.

137. Defendant CCHS acted negligently in failing to take reasonable corrective measures after it was made aware of Defendant Fleishman's sexual harassment and discrimination based on sex.

138. Defendant CCHS's failures to address Defendant Fleishman's misconduct constitute ratification of such conduct.

139. Dr. Adesanya seeks and is entitled to actual and compensatory damages for the severe mental and emotional distress that she experienced during and because of her employment in an amount to be determined by a jury but, in any event, in excess of $25,000.00.

**COUNT VII**
**ASSAULT**
**(Against Defendant Fleishman)**

140. The factual allegations contained herein are realleged and incorporated by reference as if fully set forth herein

141. Defendant Fleishman has individually committed the tort of assault upon Dr. Adesanya.

142. As described herein, Defendant Fleishman showed the intent to cause apprehension of an imminent offensive or harmful contact when he forced Dr. Adesanya into a supply closet and blocked her only exit.

143. As a direct and proximate result of this apprehension of unwanted physical contact, Dr. Adesanya has suffered and continues to suffer severe emotional distress, including, but not limited to, anxiety, depression, humiliation, embarrassment, low self-esteem, and loss of enjoyment of life.

144. Dr. Adesanya has required treatment from mental health professionals and medication to treat her severe and ongoing emotional distress.

145. Dr. Adesanya seeks and is entitled to actual and compensatory damages for the physical damages and severe mental and emotional distress that she experienced because of the assault upon her by Defendant Fleishman in an amount to be determined by a jury but, in any event, in excess of $25,000.00.

## COUNT VIII
## Intentional Infliction of Emotional Distress
## (Against Defendant Fleishman)

146. The factual allegations contained herein are realleged and incorporated by reference as if fully set forth herein.

147. Defendant Fleishman's conduct as described herein was extreme, outrageous, and exceeded the bounds of civil society.

148. Defendant Fleishman acted intentionally and/or with reckless indifference to the likelihood that his conduct would cause Dr. Adesanya to suffer severe emotional distress.

149. The intentional and/or recklessly indifferent actions of Defendant Fleishman did, in fact, cause Dr. Adesanya to suffer severe emotional distress, including, but not limited to, anxiety, depression, humiliation, embarrassment, low self-esteem, and loss of enjoyment of life.

150. Dr. Adesanya has required treatment from mental health professionals and medication to treat her severe and ongoing emotional distress.

151. Dr. Adesanya seeks and is entitled to actual and compensatory damages for the severe mental and emotional distress that she experienced because of her the conduct

of Defendant Fleishman described herein in an amount to be determined by a jury but, in any event, in excess of $25,000.00.

**<u>COUNT IX</u>**
**Negligent Infliction of Emotional Distress**
**(Against Defendant CCHS)**

152. The factual allegations contained herein are realleged and incorporated by reference as if fully set forth herein.

153. Defendant CCHS has negligently inflicted upon Dr. Adesanya severe emotional distress.

154. As described *supra*, Defendant CCHS owed Dr. Adesanya a duty of reasonable care when she was employed with Defendant CCHS, including to provide her with a safe working environment free from harassment.

155. Defendant CCHS breached this duty when it did not exercise reasonable care in responding appropriately to Dr. Adesanya's report of Defendant Fleishman's sexual harassment.

156. Dr. Adesanya's severe mental and emotional distress was the reasonably foreseeable result of Defendant CCHS's breach of its duty of care to Dr. Adesanya.

157. The negligence of Defendant CCHS did, in fact, cause Dr. Adesanya to suffer severe emotional distress, including, but not limited to, anxiety, depression, humiliation, embarrassment, low self-esteem, and loss of enjoyment of life.

158. Dr. Adesanya has required treatment from mental health professionals and medication to treat her severe and ongoing emotional distress.

159. Dr. Adesanya seeks and is entitled to actual and compensatory damages for the severe mental and emotional distress that she experienced during and because of her employment in an amount to be determined by a jury but, in any event, in excess of $25,000.00.

**COUNT X**
**Libel *Per Se***
**(Against Defendant CCHS)**

160. The factual allegations contained herein are realleged and incorporated by reference as if fully set forth herein.

161. Defendant CCHS's actions described herein constitute publication of false and defamatory statements and information about Dr. Adesanya to third persons — namely, the psychiatry department at CFV Medical Center.

162. Specifically, Defendant CCHS wrote and possessed in written form a statement reflecting that Dr. Adesanya had developed over twelve deficiencies various learning milestones in her residency program when, one month prior, Defendant CCHS had evaluated Dr. Adesanya as having possessed no relative deficiencies in her learning milestones.

163. CCHS published this statement knowing it was false.

164. CCHS' statement constitutes libel *per se* in that it diminished Dr. Adesanya in her trade or profession as the statement specifically addresses and impugns Dr. Adesanya's capacity as a resident physician.

165. This libel *per se* is ongoing in nature, and CCHS continues to refuse to correct or rescind the libelous probation notice.

166. As a direct and proximate result of CCHS's libelous statement, Dr. Adesanya was suffered damages, including, but not limited to, past and future lost wages, anxiety, embarrassment, loss of career, damage to reputation and career, mental anguish, loss of enjoyment of life, and other economic and non-economic harms.

167. As a direct and proximate result of Defendant's libelous statement, Dr. Adesanya is entitled to all legal and equitable remedies available for Defendant's libel *per se* of her in an amount to be determined by a jury, which in any event exceeds $25,000.00.

**COUNT XI**
**Breach of Covenant of Good Faith and Fair Dealing**
**(Against Defendant CCHS)**

168. The factual allegations contained herein are realleged and incorporated by reference as if fully set forth herein

169. By virtue of the contractual employment relationship between Dr. Adesanya and Defendant CCHS, Defendant CCHS had an implied duty of good faith and fair dealing to Dr. Adesanya.

170. Defendant CCHS breached its duty of good faith and fair dealing to Dr. Adesanya by falsely and improperly placing Dr. Adesanya on probation and subsequently terminating her contract.

171. As a direct and proximate result of Defendant's breach, Dr. Adesanya has suffered damages, including, but not limited to the potential loss of past and future lost wages, anxiety, embarrassment, loss of career, damage to reputation and career, mental anguish, loss of enjoyment of life, and other economic and non-economic harms.

172. Dr. Adesanya seeks and is entitled to all legal and equitable remedies available for Defendant's breach of the covenant of good faith and fair dealing in an amount to be determined by a jury, which in any event exceeds $25,000.00.

**COUNT XII**
**Breach of Contract**
**(Against Defendant CCHS)**

173. The factual allegations contained herein are realleged and incorporated by reference as if fully set forth herein.

174. Dr. Adesanya and Defendant CCHS entered into a valid contract regarding her employment as a resident physician at Cape Fear Valley.

175. CCHS breached the terms of the contract by failing to adhere to material terms including the advance written notice of an intent to non-renew the contract and the affording of an opportunity to Dr. Adesanya to contest the non-renewal decision.

176. As a direct and proximate result of Defendant's breach, Dr. Adesanya has suffered damages, including, but not limited to the potential loss of past and future lost wages, anxiety, embarrassment, loss of career, damage to reputation and career, mental anguish, loss of enjoyment of life, and other economic and non-economic harms.

**COUNT XIII**
**Tortious Interference with Prospective Economic Advantage**
**(Against Defendant CCHS)**

177. The factual allegations contained herein are realleged and incorporated by reference as if fully set forth herein.

178. Dr. Adesanya expected to establish a business relationship with prospective psychiatry residency programs.

179. Defendant CCHS was aware that Dr. Adesanya could or would seek employment and transfer opportunities with Northwest Healthcare in Tucson and Adventist Health White Memorial in Los Angeles.

180. Defendant CCHS intentionally and tortiously withheld required institutional transfer releases, training summaries, and onboarding verifications by conditioning them; Dr. Adesanya was told that the letters would be provided only if she offered her letter of resignation in advance.

181. Such interference was improper.

182. As a direct and proximate result of Defendant's breach, Adventist Health Whtie Memorial in Los Angeles revoked its formal residency offer on June 1, 2026.

183. As a direct and proximate result of Defendant's breach and for withholding the Letter of Recommendation for nearly three months, Dr. Adesanya was unable to apply for vacant psychiatry residency positions during the transfer window.

184. As a direct and proximate result, Dr. Adesanya has been unable to obtain other employment as a psychiatry resident and continued to be denied job placement as a psychiatry resident.

185. As a direct and proximate result of Defendant CCHS's actions, Dr. Adesanya has suffered damages, including, but not limited to the potential loss of past and future lost wages, reputational and professional damages, loss of enjoyment of life, and other economic and non-economic damages.

186. Dr. Adesanya seeks and is entitled to all legal and equitable remedies available for Defendant CCHS's tortious interference with prospective economic

advantages in an amount to be determined by a jury but, in any event, in excess of $25,000.00.

**COUNT XIV**
**Wrongful discharge in violation of public policy**
**(Against Defendant CCHS)**

187. The factual allegations contained herein are realleged and incorporated by reference as if fully set forth herein.

188. Dr. Adesanya was wrongfully terminated for reasons that violate the public policy of the state of North Carolina, specifically for her complaints of substandard medical practices that affected minor patients.

189. The laws and regulations of North Carolina mandate adequate standards of care for psychiatric patients including minors and Dr. Adesanya's complaints that Defendant CCHS failed to observe said standards in specific circumstances are tantamount to alleging conduct in contravention of public policy.

190. As a direct and proximate result of CCHS's wrongful discharge, Dr. Adesanya has suffered damages, including, but not limited to the potential loss of past and future lost wages, anxiety, embarrassment, loss of career, damage to reputation and career, mental anguish, loss of enjoyment of life, and other economic and non-economic harms.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Olubusayo Adesanya, M.D., requests that this Court enter judgment in her favor and against all Defendants, jointly and severally, and further:

1. Award Dr. Adesanya compensatory damages to be determined by a jury, plus demonstrated past and future pecuniary damages on each of the above-stated counts;

2. Award Dr. Adesanya punitive and exemplary damages in an amount to be determined by a jury on each of the above-stated counts;

3. Award Dr. Adesanya appropriate past and future lost income;

4. Award Dr. Adesanya attorneys' fees and costs of this action as allowable by law;

5. Tax the prejudgment interest of the damages, attorneys' fees and costs of this action to the Defendants, as of the date of the filing of this Complaint; and

6. Award Dr. Adesanya such other and further relief this Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a trial by jury with respect to each claim in this Amended Complaint.

Dated this the 5th day of October, 2026.

**HKM Employment Attorneys LLP**

*s/Artur Davis*
Artur Davis
(admitted in Alabama)
ASB-3672-D56A
2024 3rd Ave. North, Suite 212
Birmingham, AL 35203
(205) 881-0935
adavis@hkm.com

*s/Sunny Panyanouvong-Rubeck*
Sunny Panyanouvong-Rubeck
N.C. Bar No. 39966
3623 Latrobe Drive, Unit 122
Charlotte, NC 28211
(980) 734-3851
spanyanouvong-rubeck@hkm.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on this 5th day of October 2026, I electronically filed the foregoing AMENDED COMPLAINT with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record:


Jeremy D. Locklear
PARKER POE ADAMS & BERNSTEIN LLP
301 Fayetteville Street, Suite 1400
P.O. Box 389 (27602-0389)
Raleigh, North Carolina 27601
Telephone: (919) 890-4161
Facsimile: (919) 834-4564
Email: jeremylocklear@parkerpoe.com

*Counsel for Defendants*


**HKM Employment Attorneys LLP**

*s/Sunny Panyanouvong-Rubeck*
Sunny Panyanouvong-Rubeck